# JAMES KOUSOUROS

Attorney at Law

≈

80-02 Kew Gardens Road, Suite 1030, Kew Gardens, New York 11415
718-575-5450, 4131 · 718-793-0165 fax
Email; JK5665@aol.com

July 31, 2006

*(By Fax, regular mail and ecf)*
Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

### Re: *United States of America v Vincent Basciano*
### *03-CR-929 (NGG)*

Dear Mr. Garaufis;

    This letter is respectfully submitted to request a conference in order to inform the court of an issue, briefly detailed below, concerning Mr. Basciano and to hopefully resolve same.

    On July 28, 2006, the undersigned visited with Mr. Basciano at the Metropolitan Correctional Center from 9:00 A.M. until approximately 1:00 P.M. Mr. Basciano had expected to visit with his wife thereafter. The undersigned was later informed that as soon as he had returned to his floor, Mr. Basciano was placed in the Special Housing Unit or "the hole" and that he would not be permitted to have his visit. I was later informed that Mr. Basciano is being denied counsel visits as well until further notice. On Saturday, July 29, 2006 the undersigned was provided with a telephone number to call at the MCC on July 31, 2006 in order to ascertain why Mr. Basciano has been placed in solitary confinement and denied his access to counsel. We have still not received a return call. I contacted Assistant United States Attorney Thomas Seigel who informed me that the government was aware of the situation but could not provide details to counsel at this time. While the government is mindful of Mr. Basciano's rights relative to his having access to counsel, and while the government hopes to reinstate said access within a reasonable time, again, Mr. Siegel was understandably unable to provide any further details to the undersigned given the pending nature of the situation. Hence, this letter

requesting a conference in order to hopefully expedite a resolution to the immediate concerns posited herein.

As the court is aware, the undersigned is currently preparing for the commencement of the retrial of unresolved and additional counts from Indictment 03-929 (NGG) and given the voluminous record heretofore generated, weekly meetings with my client are indispensable to the effective preparation of the case. As such, we respectfully submit that Mr. Basciano's access to counsel must be immediately reinstated.

Thank you for your courtesy.

Very Truly Yours,

JAMES KOUSOUROS

Cc;     Greg Andres
        Thomas Seigel
        Winston Chan
        United States Attorney's Office
        Eastern District of New York
        225 Cadman Plaza
        Brooklyn, New York 11201

        Ying Stafford, Esq.
        276 5th Avenue, Ste 501
        New York, New York 10016

        Ephraim Savitt, Esq.
        260 Madison Avenue
        New York, New York 10016

        Vincent Basciano
        Inmate No. 30694-054
        Metropolitan Correctional Center
        150 Park Row
        New York, New York 10007-1779

08_02_06_BASCIANO[2].txt

1

```
 1                        UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF NEW YORK
 2      - - - - - - - - - - - - - - - - X

 3    UNITED STATES OF AMERICA,      :        05 CR. 060

 4               v.                  :        U.S. Courthouse
                                              Brooklyn, New York
 5    VINCENT BASCIANO, :
                                              August 2, 2006
 6               Defendant,          :        11:30 a.m.

 7     - - - - - - - - - - - - - - - X

 8
                          TRANSCRIPT OF PROCEEDINGS
 9                   BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
                        UNITED STATES DISTRICT JUDGE
10

11    APPEARANCES:

12
      For the Government:          ROSLYNN R. MAUSKOPF
13                                 United States Attorney
                                   BY:    THOMAS SEIGEL
14                                        WINSTON CHAN
                                   Assistant U.S. Attorneys
15                                 One Pierrepont Plaza
                                   Brooklyn, New York 11201
16

17    For the Defendant:          JAMES KOUSOUROS, ESQ.
                                   EPHRAIM SAVITT, ESQ.
18                                 YING STAFFORD, ESQ.

19

20
      Court Reporter:             Burton H. Sulzer
21                                225 Cadman Plaza East
                                  Brooklyn, New York 11201
22                                (718) 613-2481
                                  Fax # (718) 613-2505
23

24

25    Proceedings recorded by mechanical stenography, transcript
      produced by CAT.
```

BHS     OCR     CM     CRR     CSR

ŋ

08_02_06_BASCIANO[2].txt

2

1           (Open court-case called-appearances noted.)

2           THE COURT:  Good morning.

3           MR. KOUSOUROS:  Your Honor, thank you very much for

4   calling our hearing as I requested in my letter of July 31st.

5           As the court is aware from my letter, I guess, on

6   Friday, I believe it's July 28, 2006, after counsel had left

7   Mr. Basciano at the Metropolitan Correctional Center, he was

8   returned upstairs and as he was getting prepared for a

9   personal visit at approximately 4:30, 5:00 o'clock in the

10  afternoon, he was taken to the Special Housing Unit, at which

11  point he was denied all visits.

12          I had gone down Saturday morning -- Miss Stafford

13  did as well -- to inquire as to what was going on.  We were

14  given the name of an individual to call Monday morning who

15  still hasn't returned my calls, but Mr. Seigel as good enough

16  to.

17          We were informed that not only was he being denied

18  personal visits, he was being denied any and all visits

19  completely.  I spoke to Mr. Seigel about it and basically

20  asked him, instead of having to request court intervention, if

21  the government could tell me either what was going on or give

22  me a time frame for its resolution and perhaps we could have

23  resolved it that way.

24          The government was not at liberty to do so; hence, I

25  was constrained to request this court's intervention.  I find

BHS       OCR      CM      CRR      CSR

ij

3

08_02_06_BASCIANO[2].txt

1   out this morning, first from my client and then from Mr.
2   Seigel, that the order has been amended to the extent that I
3   and Mr. Savitt will be permitted access to Mr. Basciano.  I
4   requested a time frame -- again, I'm not asking for anything
5   they don't want me to know or anything, I don't need to know,
6   just a time frame.  Mr. Seigel declined to provide that or any
7   information as to the substance of the investigation.

8          Here are our issues, with all due respect.  I'm
9   happy I can have access to my client, but, first of all, he's
10  in SHU, which is, aside from unduly restrictive and somewhat
11  oppressive, he is denied everything else when he's in a
12  Special Housing Unit.  We don't know why.

13         It makes it very difficult for me and for Mr. Savitt
14  to visit him with the frequency we need to.  As you know, I've
15  got a 9500 page transcript to review and a trial to prepare
16  for and it's coming soon and I need to spend a lot of time
17  with Mr. Basciano.

18         Secondly, and even more important, Judge, we are
19  interviewing lawyers, we have interviewed several attorneys to
20  come in and do some writing for us on the 03 case.

21         As you know from my second letter -- and I haven't
22  written you since I came onto the case, but I also sent you a
23  letter concerning the 05 case, Mr. Basciano needs to interview
24  and, if he can, retain trial counsel, if it's not going to be
25  me or if it is going to be me.

Burton H. Sulzer - OCR, CM, CRR

:J

4

1          There are things that need to be done and they need

Page 3

08_02_06_BASCIANO[2].txt

2    to be done now.  We have gotten a schedule from you, we are

3    abiding by it.  We have a trial schedule.  We are planning on

4    doing the 03 case in January.  There is a lot of work that

5    needs to be done.  Mr. Savitt is learned counsel on the 05

6    case.  There is an investigator who needs access to the client

7    but who is being denied access to the client.

8          We're not, with all due respect, sir, prepared to

9    accept nothing in terms of an explanation or any due process

10   concerning these issues because they are of paramount

11   importance.

12         So I don't know how we resolve re this here, but we

13   want to know what's going on, we want to know why he's being

14   denied in whatever forum you believe it's appropriate.  If it

15   needs to be in camera, we'll do that.  We're not looking to

16   jeopardize any investigation, we're just looking for legal and

17   appropriate answers.

18         THE COURT:  Before I ask the government to respond,

19   let me ask you some questions about your letter.

20         MR. KOUSOUROS:  Which one?

21         THE COURT:  August 1st.  I know about the other one.

22   What is the other one?

23         MR. KOUSOUROS:  July 31st, but I know the letter to

24   which you're referring.

25         THE COURT:  This is the one that talks about your

Burton H. Sulzer - OCR, CM, CRR

5

1    representation of Mr. Basciano and Mr. Levin and --

2          MR. KOUSOUROS:  Right.

3          MR. SEIGEL:  I have that.
                    Page 4

08_02_06_BASCIANO[2].txt

4          THE COURT:    It's the one that I'm concerned about,
5    the August 1st letter right now.

6          Having looked at both of them, you are Mr.
7    Basciano's counsel on the 03 case and the 05 case?

8          MR. KOUSOUROS:    I was retained as trial counsel to
9    retry the 03 case.    I'm in for that trial, for those
10   proceedings, to their conclusion.

11         As the court is aware, last week Mr. Levin filed, I
12   think it was last week, July 20th, I'm sorry, filed a motion
13   to be relieved.    I know you haven't decided it, but he filed a
14   motion to be relieved.    I can tell you that the relationship
15   which you saw somewhat deteriorating has deteriorated further
16   and there is no contact between them.

17         THE COURT:    He was counsel in both cases.

18         MR. KOUSOUROS:    He is --

19         THE COURT:    And -- go ahead.

20         MR. KOUSOUROS:    He's off the 03 case, you relieved
21   him except for his obligation to file a Rule 29, which he may
22   be absolved of shortly anyway, but he is going to live by that
23   obligation.

24         He was also retained quite some time ago on the 05
25   case.    He moved on July 20 of '06 to be relieved on the 05

Burton H. Sulzer - OCR, CM, CRR

:I

6

1    case.    We anticipate that you'll grant it based on the facts
2    therein, but also the deterioration of the relationship.

3          What I've asked you is simply this.    Right now Mr.
4    Basciano, relative to the 05 case, which is a death eligible

Page 5

08_02_06_BASCIANO[2].txt
5   case, de facto has no trial counsel. He's got as good a

6   learned counsel as you can find, but he's not got no trial

7   counsel. He has asked me, because there are things that need

8   to be done, to come onto the 05 case --

9           THE COURT: I haven't Mr. Levin out of the death

10  eligible case. I'm not letting him out unless there's a

11  replacement.

12          You were not here at the time, but I've already

13  said, if Mr. Basciano files an affidavit of his finances

14  and -- that he's financially unable to retain counsel, then

15  the court will appoint counsel for him, but one way or the

16  other, there has to be someone in place at all times to

17  represent him as his primary attorney.

18          MR. KOUSOUROS: What I'm saying to you --

19          THE COURT: That is the court's position.

20          MR. KOUSOUROS: Your Honor, we respect that position

21  because it's the right position. All I'm saying to you is

22  this, respectfully, accept my notice. I just am very candid

23  with courts, I'm not going to file a notice and tell you three

24  months down the line I can't try the case.

25          I want to be up front and tell you that you know I'm

Burton H. Sulzer - OCR, CM, CRR

1   trying the 03 case. Right now you've got an April trial date.

2   we are promising, giving you our word that he will have trial

3   counsel in place. He always has, he's always had trial

4   counsel in place.

5           We're not prepared honestly to tell whether you the

6   finances are such that he won't be able to retain; we're not

08_02_06_BASCIANO[2].txt

7  going to prematurely make an application for you to appoint

8  somebody only then to retain somebody later.

9          All I'm asking you is this. Accept my notice. You

10  will have an attorney paying attention -- not that Mr. Levin

11  isn't -- but an attorney paying attention in place right now,

12  your deadlines will be met, the case will be attended to. I'm

13  simply saying to you that I'm in this case, with your

14  permission, but not yet as trial counsel. In the event I'm

15  not going to be trial counsel, this court will have ample

16  notice --

17          THE COURT: Of which case?

18          MR. KOUSOUROS: I'm only talking about the 05 case.

19  This court will have ample notice and these proceedings will

20  not be delayed for lack of an attorney.

21          THE COURT: Mr. Savitt, where are you with respect

22  to the mitigation submission for the 05 case?

23          MR. SAVITT: Well, initially a mitigation submission

24  was made to the U.S. Attorney's office last November and at

25  this point we're working to supplement that submission.

Burton H. Sulzer - OCR, CM, CRR

ll

8

1          THE COURT: What is the deadline?

2          MR. SAVITT: I believe it's August 21st.

3          MR. SEIGEL: That's correct, Judge.

4          THE COURT: Is Mr. Levin working on that or is that

5  just you?

6          MR. SAVITT: Actually, it's Miss Stafford and Mr.

7  Kousouros and myself.

08_02_06_BASCIANO[2].txt

8          MR. SEIGEL:   Can I say something on the issue of the
9    notice of appearance?   I don't think -- I mean what Mr.
10   Kousouros is asking is something I don't think the court
11   should give -- is not really for the court.   In other words,
12   if an attorney files a notice of appearance, there is no such
13   thing as a partial notice -- you're in or you're not in.

14          If Mr. Kousouros files a notice, he's lead trial
15   counsel by default.   Mr. Savitt has a special role as learned
16   counsel, so he can say all these words to you about how his
17   role is limited, but there is no form for limited notice of
18   appearance -- he's in.   Which means that he runs the risk that
19   if no one else is in, the court will order him to stay in and
20   try the 05 case.

21          Separate from the court, if Mr. Basciano and Mr.
22   Kousouros hire other lawyers and they have different roles and
23   they all file notice of appearances, as long as they don't
24   have any conflict that is obviously fine.   What he's asking
25   for is sort of the court to bless his limited appearance.   I

Burton H. Sulzer - OCR, CM, CRR

II

9

1    don't think that's possible.

2          THE COURT:   What I'm hearing from Mr. Savitt, as a
3    practical matter, is that Mr. Kousouros is participating in
4    the preparation of the mitigation supplementation for the 05
5    case.   So in effect, he's in the 05 case, even if he says "I
6    may not try it."

7          Well, we're nowhere near getting that case tried, so
8    if Mr. Basciano finds another attorney to try the case, why
9    that will be what happens.   But in the meantime -- that's why

Page 8

08_02_06_BASCIANO[2].txt

10   I was a little concerned about this letter, and I don't want
11   to go line by line, but it made representations about the
12   somewhat ambiguous, I would say, ambiguous form of conditions
13   of representation, and I want to make sure that Mr. Basciano
14   currently, this moment, has both lead counsel and learned
15   counsel on the 05 case so that there's no issue, should there
16   ever be an appeal in that case, from a death sentence that he
17   had counsel throughout, active counsel, not Mr. Levin sitting
18   in Long Beach, you know, in his cabana -- all right -- but
19   that there's lead counsel now and there's learned counsel now
20   and throughout.   That's where I am.

21            MR. KOUSOUROS:  Your Honor, respectfully, that is
22   the right place to be.  I respectfully disagree with the
23   government.

24            THE COURT:  I don't care about what the government
25   says.  I only care that you tell me that currently you are

Burton H. Sulzer - OCR, CM, CRR

0

10

1   actively Mr. Basciano's lead counsel on the 05 case.  What
2   happens next week, next month, next year, if it should change,
3   you'll advise me and we'll all come in and talk about it
4   again.

5            MR. KOUSOUROS:  I understand that.  I'm simply --
6   you're right.  I'm simply saying this --

7            THE COURT:  Mr. Basciano is nodding in the
8   affirmative, so maybe you ought to talk to him about whether
9   you're his lead counsel.

10            MR. KOUSOUROS:  Now that I have been informed that I

Page 9

08_02_06_BASCIANO[2].txt

11    can do that, I'll probably do that.

12          THE COURT:  Do what?

13          MR. KOUSOUROS:  Talk to him.

14          THE COURT:  You haven't talked to him?

15          MR. KOUSOUROS:  Constantly, Judge.  Judge, we don't

16    need to belabor the point, I'm simply saying --

17          THE COURT:  I'm trying to get you to say one way or

18    the other, just tell me.

19          MR. KOUSOUROS:  I'm going to say it.

20          THE COURT:  This is not your letter.

21          MR. KOUSOUROS:  My point is candor with the court.

22    I am lead counsel on the 05 case.  I will work on the 05 case,

23    not in a limited capacity, 100 percent.  When I'm on, I'm on

24    100 percent.

25          I'm simply saying to you that at this point I cannot

Burton H. Sulzer ~ OCR, CM, CRR

II

11

1  ·comit to you, whenever it happens, at this point as I stand

2   before you that I'll be trying it, because that's the right

3   way to be with the court.

4          THE COURT:  He may decide he doesn't want you to try

5   it.  I'm not talking about some event that may take place six

6   months or a year from now, I'm only concerned about going

7   forward during this critical time that Mr. Basciano have

8   active lead counsel on the 05 case during the mitigation

9   process.

10          You've now told me that you're it.  We don't need to

11   discuss it anymore.  I'm satisfied.  It's on the record.  You

12   made your representation.  I don't hear anything else.  Let's

08_02_06_BASCIANO[2].txt

13    talk about the issue that brought us here.

14           MR. SEIGEL: Your Honor, at this stage, the

15    government, because of investigative and security concerns, is

16    not in a position to discuss with defense counsel what has

17    precipitated Mr. Basciano's placement in the Special Housing

18    Unit.

19           It's something that is being worked on actively and

20    we at a later time will be in a position to say more, but for

21    right now, we would be jeopardizing too many things to do

22    that.

23           MR. KOUSOUROS: My problem is that as an

24    incarcerated detainee, he's got right of access to the courts,

25    as the Supreme Court has stated repeatedly --


                      Burton H. Sulzer - OCR, CM, CRR

||

                                                                      12


1            THE COURT: He's here, isn't he?

2            MR. KOUSOUROS: It means access to his counsel and

3    that which he needs to prepare a defense, access to the

4    courts.

5            Again, if the government would permit Mr. Ron Dwyer,

6    the investigator, to see him, if he would permit -- right now,

7    we are hopefully going to engage Stephanie Kravling to do

8    writing for us. I'm simply saying to you, without an

9    explanation, without a reason these are -- either his counsel,

10   his potential counsel, clearly his investigator who is

11   investigating -- as long as they will lighten it up and let

12   him see his investigators and let him interview lawyers, he's

13   getting what he needs.

                              Page 11

08_02_06_BASCIANO[2].txt

14          I would respectfully submit to you that more is
15   needed to keep him in the Special Housing Unit.  I can't tell
16   you only go so far in certain circumstances.  Maybe they can
17   tell you, but to simply walk out of the courtroom with just
18   Ephraim Savitt and James Kousouros being able to see him when
19   he needs to see his investigators, when he needs to interview
20   counsel, when he's looking at a potential death penalty, when
21   a submission, a supplemental mitigation submission needs to be
22   submitted within the next three weeks, every day counts.
23          THE COURT:  Let me ask Mr. Savitt a question as
24   learned counsel.
25          Are there necessary visits by other professionals


                    Burton H. Sulzer - OCR, CM, CRR

IJ

                                                              13


1    retained by you in connection with the 05 case that are
2    necessary between now and the time that you make your
3    submission?
4           MR. SAVITT:  Yes.  Certainly by Miss Stafford in
5    terms --
6           THE COURT:  By Miss Stafford?
7           MR. SAVITT:  Absolutely.  To some extent, the
8    investigator as well.
9           Some of the submissions, the supplemental
10   information, will be based on events that obviously transpired
11   after the November submission and they will be fact based.
12          MR. SEIGEL:  We are willing to speak with the warden
13   about adding Miss Stafford to the list of people that can see
14   him, but we would like to keep it with attorneys who have
15   filed a notice of appearance before your Honor at this time.
                              Page 12

08_02_06_BASCIANO[2].txt

16          MR. KOUSOUROS: If I can ask you this, Judge?

17          THE COURT: Let me, before you ask me, about how

18     long do you think it's going to take you to sort out whatever

19     this is that you're sorting out?

20          MR. SEIGEL: Judge, the answer is we'd like to do it

21     as fast as possible and we're working toward that. Some of

22     the timing is not completely under our control, so I don't

23     want to give an estimate that is too unduly positive, but

24     we're working as fast as we can.

25          We don't hope that it takes too long before we get

Burton H. Sulzer - OCR, CM, CRR

14

1      to a situation where we can provide some information to the

2      defense, but we're just not there yet.

3          THE COURT: Go ahead.

4          MR. KOUSOUROS: Well, I'm really -- I appreciate

5      that they are going to hopefully have Miss Stafford back in as

6      she is certainly indispensable here.

7          I'm not -- respectfully, Judge, I'm not satisfied

8      otherwise and if the government cannot tell us, I want them to

9      tell you in camera. I certainly trust the court's judgment,

10     because I have to say, one of -- Mr. Dwyer meets -- I go there

11     every Friday, we meet, we are conducting an investigation.

12     We're doing the best that we can to do it all on that day. I

13     have to tell you, I'm leaving for two weeks in August. I want

14     these --

15          THE COURT: When are you leaving?

16          MR. KOUSOUROS: August 13th.

Page 13

08_02_06_BASCIANO[2].txt

17      THE COURT:  Then you can come back here on

18   August 11th -- we may see where we are on August 11th, at

19   noon.

20      MR. KOUSOUROS:  Would you be kind enough --

21      THE COURT:  Unless the matter is resolved before

22   then, in which case -- when I say resolved before that, unless

23   you're advised as to what the circumstances are before that

24   and you feel that there's not a need to have such a status

25   conference or if the matter is resolved --


Burton H. Sulzer - OCR, CM, CRR

0

15


1      MR. SEIGEL:  That is nine days from now.  We will do

2   our best.  We may not be in a position yet to reveal

3   information.

4      THE COURT:  If it's not resolved, you'll tell me.

5   If it is resolved you'll tell me.  If you don't need a status

6   conference you'll tell me in advance.  Call Mr. Recoppa and

7   you won't produce Mr. Basciano and that will be it.

8      At this moment, I believe that in order to keep a

9   close eye on this, and by virtue of the fact that we still

10   don't know for sure whether Miss Stafford will be permitted in

11   there by the warden, I'd like to have that status conference

12   on the 11th of August when I will be here.

13      I strongly recommend that the warden make that

14   revision in his order.

15      MR. SEIGEL:  Yes, Judge.

16      THE COURT:  All right.  Anything else?

17      MR. KOUSOUROS:  Here's the only other thing.

18   August 11th is nine days from now.  There's an indication it

Page 14

08_02_06_BASCIANO[2].txt

19  may not be resolved.  I still respectfully ask that the court
20  be provided with the information in camera so that on
21  August 11th, should the government tell you it's not resolved,
22  perhaps the court would be in a position to resolve some of
23  it, at which point the court might be on August 11th having
24  knowledge of what's going on say, Look, you got to let lawyers
25  in.  You have to let the investigator in.

Burton H. Sulzer - OCR, CM, CRR

16

1           Even if, for example -- while we certainly hope that
2   is not the case, even if the SHU issue is not resolved, we
3   don't want you to get the information on the 11th and have to
4   hastily make a decision.  We should have the information so
5   perhaps on the 11th you'll be prepared.
6           THE COURT:  I won't make any hasty decisions and the
7   government, I expect the government to keep me informed as
8   must as possible and --
9           MR. SEIGEL:  We will do that.
10          THE COURT:  We'll see where we are on August 11th.
11  Anything else?  Mr. Savitt?
12          MR. SAVITT:  Your Honor, not at this point.
13          MR. KOUSOUROS:  Does Mr. Basciano need to stay in
14  Special Housing at this time?
15          MR. SEIGEL:  Yes.
16          MR. KOUSOUROS:  I would also ask the court to direct
17  the government that on the 11th that issue be addressed as
18  well.
19          THE COURT:  You can raise any issues you want when

Page 15

08_02_06_BASCIANO[2].txt
20  you're in front of me on August 11th.  Whatever issues still

21  exist, you can always raise them before me on August 11th and

22  I will be happy to hear from you and hear from the government

23  on any open issues.  Thank you very much.  Have a nice day.

24                    **********

25

Burton H. Sulzer - OCR, CM, CRR

Page 16


ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

## INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _8/3/06_

INMATE'S COMMENTS:

1. Complaint: _In court the Prosecutor, Winston chan said I must go through my Administrative Remedies First. I want like to know why I'm in the SHU. Am I want ask to Be put Back into population._

2. Efforts made by you to informally resolve: _I don't know why I'm here_

3. Names of staff you contacted/Date you contacted the staff: _Counselor Gunner, I've asked every Lt. in the building As to why I am here_

Date returned to Correctional Counselor: _____

_Vincent J. Basciano_      _30694-054_      _8/13/06_
Inmate's Name        Register Number        Date

## CORRECTIONAL COUNSELOR'S COMMENTS:

1. Efforts made to informally resolve and staff contacted: _according to correctional services It is because of security concerns, you are housed in the Special Housing Unit_

Date informally resolved: _____   Counselor Signature: _____    _8-12-2006_

Date BP-229(13) Issued: _____

Unit Manager: _J. Moore_

# JAMES KOUSOUROS

Attorney at Law

∞

80-02 Kew Gardens Road, Suite 1030, Kew Gardens, New York 11415
718-575-5450, 4131 · 718-793-0165 fax
Email; JK5665@aol.com

July 31, 2006

Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> *Re:*   *United States v. Vincent Basciano,*
> 05 CR 0060 (S-6) (NGG)

Dear Judge Garaufis;

We are submitting the following letter-brief in advance of the conference scheduled for August 11, 2006 to discuss and hopefully resolve Mr. Basciano's present detention status.

As the court is aware, the government has, without explanation, completely isolated Mr. Basciano, prohibiting all telephone calls and visits in conjunction with having placed him in the Special Housing Unit of the Metropolitan Detention Center. At the request of counsel, this court held a brief hearing on August 2, 2006 to address this matter. During the hearing, the government refused to disclose the reason for the isolation of Mr. Basciano, but did agree that the undersigned and Ephraim Savitt, learned counsel, were now authorized to see Mr. Basciano, who to that point had been prevented entirely from meeting with counsel. The government also agreed to permit Ying Stafford Esq., assigned to assist Mr. Savitt in the death penalty litigation, to resume meeting with Mr. Basciano. However, the restrictions on all telephone privileges and the limited visitation he had been permitted with his wife continue unabated. As a consequence, we now move, pursuant to **28 U.S.C. § 2241** and the Bail Reform Act contained in **18 U.S.C. §3142** for an Order directing the government and the Bureau of Prisons to release Mr. Basciano from administrative detention at the Metropolitan Correctional Center and return him to general population. The conditions under which Mr. Basciano is currently being detained are deplorable and intolerable. These conditions have thwarted counsel's ability to effectively prepare for the upcoming trials and to consult with Mr. Basciano concerning the death penalty litigation currently in progress.

In an Order filed on May 5, 2005 releasing Mr. Basciano from the very same Special Housing Unit, this court detailed the conditions to which we refer:

> Unit 10 South is considered to be the most secure housing available at any Bureau of Prisons (BOP) facility in the New York City metropolitan area, and is generally reserved for terrorism suspects, detainees who have shown themselves to be a danger to other inmates and/or prison guards, and cooperating witnesses. Detainees in 10 South are confined to cells with blacked out windows 23 hours per day during the week, and round-the-clock on weekends. Despite representations from the government that the lights in the SHU can be turned off, Basciano asserts that the lights are left on 24 hours a day. Access to radios, and reading materials, including legal papers, appears in practice to be quite limited. Meals are received on trays that are pushed through a narrow slot in the cell door. Finally, and perhaps most significantly, Basciano's contacts with other human beings have been sharply curtailed. He receives only one social visit per week, is not permitted to speak to anyone while in his cell, and his telephone privileges are described by his counsel as 'nonexistent'.

## Memorandum and Order, May 5, 2005, pp.2-3.

While many of this court's observations continue to apply with equal force, the conditions in the "SHU" have worsened. Mr. Basciano is permitted *no* legal papers, and is thus unable to knowledgeably discuss the previous proceedings, the upcoming trial or, of utmost significance, the issues pertaining to the death penalty litigation currently in progress. As for his access to contact with other human beings, Mr. Basciano has been denied *all* visitation other than the three attorneys now permitted to meet with him. He is not allowed *any* telephone calls. Moreover, these onerous conditions have been exacerbated by the sweltering heat that has befallen New York City this summer. As of the filing of this submission, Mr. Basciano has been in the "SHU" for more than one week and he has lost several pounds. The temperature is unbearable. When the undersigned visited with Mr. Basciano on August 3, 2006, the latter entered the visiting room sweating, pale and drawn. He had none of his legal papers and the discussion was demonstrably less productive and informative .

When the court was last called upon to address the government's decision to isolate Mr. Basciano in this manner, the matter was litigated for several weeks. Mr. Basciano remained in the SHU for months, until this court found the government's reasons for the complete segregation to be unnecessary, and in conflict with Mr. Basciano's ability to assist in his defense. We ask that this court act without delay and not permit this situation to persist indefinitely. It is one thing for the government to take this action, with proper and informed notice so that the matter can be litigated properly, but another for them to clandestinely deprive the defendant of the due process to which he is entitled. Indeed, we cannot even address the merits of this sudden and unannounced movement of Mr. Basciano, as the government has refused to disclose the ostensible reasons therefor.[1]    Mr. Basciano has not yet

---

[1]    We are mindful of the analysis delineated in **Bell v Wolfish**, 441 U.S. 520 (1979) to determine whether the action is punitive or "an incident of some other legitimate governmental purpose" (id. At 538-539). We are unable to even

been sentenced and accordingly, no judgment of conviction has been filed or entered. He is still preparing for the re-trial of serious substantive charges, and a discrete trial on yet other serious charges. Mr. Basciano was currently in the midst of preparing, together with counsel, supplemental mitigation submissions concerning the government's decision as to the applicability of the death penalty on 05-Cr-0060. As such, his status as a detainee under the Constitution remains unchanged. As a pre-trial detainee, Mr. Basciano is entitled to his full panoply of constitutional rights. **Willis v Artuz**, 301 F.3d 65 (2d Cir. 2002); *cf.* **Hewlett v Holmes**, 459 U.S.460 [administrative detention of a sentenced inmate charged with participation of a prison riot in which serious injuries were sustained by prison staff upheld where security threat amply established at a hearing];

The conditions outlined above, the manner in which they were imposed, and the government's obvious position that they will dictate when and for how long this segregation will continue, constitute cruel and unusual punishment violative of the Eighth Amendment to the United States Constitution. Mr. Basciano's ability to assist in his defense on the re-trial, the trial to follow, and most importantly, the submissions relative to the government's recommendation concerning the death penalty are severely compromised. As such, his segregation under these conditions constitutes a violation of his Fifth and Sixth Amendment rights.

In its 2005 order, the court made the following observations, which we submit, resound most clearly to the present situation:

> The foremost factor informing my conclusion is the reality that Basciano is a death-eligible defendant whose attorneys are now preparing to make a mitigation submission to the Attorney General. It is therefore of the *utmost importance* that Basciano be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him. Yet Basciano's detention in the SHU *presents both practical and psychological obstacles* to this result. As a practical matter, the security restrictions in place in the SHU make it *much more difficult for Basciano to have productive meetings with his counsel*, as Basciano's attorneys have credibly argued.

**Memorandum and Order**, 05-CR-0060 (NGG), pp. 12-13)(emphasis added).

In addition to the practical limitations on the effective exercise of his right to counsel, the court also considered factors of a more nuanced nature:

> More importantly, it is well documented that long periods of solitary confinement can *have devastating effects on the mental well-being of a detainee.* See, e.g., Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)("Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including *increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity,*

---

address this analysis as the government has not identified it's purpose in segregating Mr. Basciano.

*ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses…*There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects"). Taken together, the urgency of Basciano's need to marshal his legal defense in the hopes of avoiding a death-penalty trial and the likely effect of continued solitary confinement on Basciano's mental state require that the government reserve the "nuclear option" of indefinite confinement until it is clear that less restrictive options have failed to constrain Basciano.

**Id**, (emphasis added)

The current situation is no less urgent despite the lesser period Mr. Basciano has been confined in the "SHU." At this moment, the government is preparing and submitting it's recommendation concerning the imposition of the death penalty to the Attorney General, in keeping with the August 21, 2006 deadline. Mr. Basciano and counsel *were* preparing a supplemental mitigation submission in an effort to convince the government to not recommend death as a penalty. It is inconceivable that our system of justice can permit the government to impose a "nuclear option" of incarceration upon a pre-trial detainee at the same time the very same defendant must feverishly work with counsel to convince the government to **not** seek an option of an even greater incendiary nature – death – as a sentence.

The Supreme Court has made all too clear that in a capital case, counsel must investigate and pursue every arguably mitigating factor which exists on behalf of a client. **Wiggins v Smith**, 539 U.S. 510 (2003). The pursuit of mitigation is an ongoing and evolving process. In this case, the initial submission was made prior to the first trial of indictment 03-CR-929. The current submission is after the trial of a separate matter, in which Mr. Basciano was convicted of serious charges and thus faces a significant prison sentence. Therefore he now faces a heretofore unanticipated re-trial, in addition to the later trial for which the death penalty is a potential sentence. These facts present additional issues of mitigation as they relate to Mr. Basciano and his wife and children.

Additionally, as the court is aware, other issues have arisen concerning the credibility of Joseph Massino, which are the subject of a second submission relating to the events which precipitated the tape recorded in-prison conversations between Mr. Basciano and Massino.[2] The analysis of this information requires the attentive and productive participation of Mr. Basciano, as these conversations must be re-analyzed in light of the revelations concerning Massino. These issues must also be addressed in the defense mitigation submission not only in terms of Massino's credibility, but also in terms of Massino's status as an "equally culpable defendant" within the ambit of § 3592(a)(4).

In conclusion, Mr. Basciano's need to confer with counsel, to meet with his wife, and in truth,

---

2   In a separate submission filed on this day, the defense requested an Order directing the government to provide all relevant materials pertaining to a lie detector test administered to Massino after his offer of cooperation to the government. Upon information and belief, Massino failed the lie detector test and after being rejected by the government, he convinced the government to equip him with a wire, while in prison, to tape conversations with Basciano and thus deliver the goods on Basciano and receive consideration from the government in the form of his life and some of his money.

to be treated as a human being while a detainee pending trial and possibly death, mandates that he be released from the Special Housing Unit at the MCC and returned to population. Additionally, and in order to prevent such abusive action in the future, we ask that if and when the government intends to repeat such action, that appropriate notice be given to the court, and then if the court deems it appropriate, to counsel, so that these issues can be addressed without unwarranted delay.

Respectfully submitted,

JAMES KOUSOUROS

Cc;   Thomas Siegel
      Winston Chan
      Greg Andres
      Assistant United States Attorneys

      Ephraim Savitt, Esq.

      Ying Stafford, Esq.

      Vincent Basciano



ATTACHMENT 1

# METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

## INFORMAL RESOLUTION FORM (BP-8)

**NOTE TO INMATE**: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____ 8/13/06

**INMATE'S COMMENTS:**

1. Complaint: _In court the Prosecutor, Winston chang says I must go through my administrative Remedies First. I want like to know why I'm in the SHU. Am I want to ask to be put Back into population._

2. Efforts made by you to informally resolve: _I don't know why I'm here_

3. Names of staff you contacted/Date you contacted the staff:
_Counselor Spencer, I've asked every Lt. in the building As to why I am here_

Date returned to Correctional Counselor: _____

Vincent J. Boscirno    30694-054    8/13/06
Inmate's Name    Register Number    Date

## CORRECTIONAL COUNSELOR'S COMMENTS:

1. Efforts made to informally resolve and staff contacted: _According to correctional services it is because of security concerns, you are housed in the Special Housing Unit._

Date informally resolved: _____    Counselor Signature: _____    8-17-2006

Date BP-229(13) Issued: _____

Unit Manager: _J. Moore_

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: __Basciano, Vincent, J.__    __30694-054__    __9-5 G__    __M.C.C.__
    LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A- INMATE REQUEST**

    I Received my Response from my (BP-8). It state that I'm in S.H.U. for security Reasons.

    I've been incaradeanted almost two years. I've been in M.C.C. for the last eighteen months. I havent had any Disiplinan problems in all the time I've been Incarcerated.

    Could you please explain what the security problem is.

    I'm only allowed two phone calls and only two visitors. An one of my visitors, my 15 year old son, has only been in one time to see me since he has been Approved.

    And all my phone calls are monitored.

__8-27-06__
DATE

_____
SIGNATURE OF REQUESTER

**Part B- RESPONSE**

_____
DATE

_____
WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE      CASE NUMBER: _____

                     CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
    LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

Exhibit C

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: AUGUST 24, 2006

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      NEW YORK MCC

TO  : VINCENT JOHN BARCIANO, 30694-054
      NEW YORK MCC     UNT: H   QTR: Z01-953LAD
      150 PARK ROW
      NEW YORK,  NY 10007

FOR THE REASONS LISTED BELOW, THIS ADMINISTRATIVE REMEDY REQUEST
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID      : 424811-F1      ADMINISTRATIVE REMEDY REQUEST
DATE RECEIVED  : AUGUST 24, 2006
SUBJECT 1      : ADMINISTRATIVE DETENTION - PLACEMENT, REVIEWS, RELEASE
SUBJECT 2      :
INCIDENT RPT NO:

REJECT REASON 1: YOU DID NOT ATTEMPT INFORMAL RESOLUTION PRIOR TO SUBMISSION
                 OF ADMINISTRATIVE REMEDY, OR YOU DID NOT PROVIDE THE
                 NECESSARY EVIDENCE OF YOUR ATTEMPT AT INFORMAL RESOLUTION.

REJECT REASON 2: YOU MAY RESUBMIT YOUR REQUEST IN PROPER FORM WITHIN
                 5 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REMARKS        : YOU MUST SUBMIT YOUR INFORMAL RESOLUTION (BP8)
                 WITH YOUR ADMINISTRATIVE REMEDY.

✻ INMATE  RECEIVED  THIS
    NOTICE  ON  AUGUST 27, 2006

    Joyce Moore
        UNIT MGR

1

1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - - X
3
4     UNITED STATES OF AMERICA,      :    05-CR-060(NGG)

5                                    :
            -against-                :    United States Courthouse
6                                    :    Brooklyn, New York

7                                    :

8     VINCENT BASCIANO,              :    August 28, 2006
                                     :    11:00 a.m.
9            Defendant.              :

10   - - - - - - - - - - - - - - - - X

11          TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
               BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
12                UNITED STATES DISTRICT JUDGE

13                    A P P E A R A N C E S:

14   For the Government:  ROSLYNN R. MAUSKOPF, ESQ.
                          United States Attorney
15                        Eastern District of New York
                          one Pierrepont Plaza
16                        Brooklyn, New York 11201
                       BY: WINSTON CHAN, ESQ.
17                        Assistant United States Attorney

18   For the Defendant:   JAMES KOUSOUROS, ESQ.
                          EPHRAIM SAVITT, ESQ.
19                        STEPHANIE, CARVLIN, ESQ.
                          YING STAFFORD, ESQ.
20
     Court Reporter:   Anthony D. Frisolone, CSRR, RMR, CRI
21                     Official Court Reporter
                       Telephone: (718) 613-2487
22                     Facsimile: (718) 613-2694
                       E-mail:   AFrisolone@aol.com
23
     Proceedings recorded by computerized stenography.  Transcript
24   produced by Computer-aided Transcription.

25

Anthony D. Frisolone, CSRR, RMR, CRI

1

2          (In open court.)

3          (Defendant enters the courtroom.)

4          COURTROOM DEPUTY:  Criminal cause for status

5    conference, United States versus Vincent Basciano.

6          Counsel state your appearances for the record.

7          MR. CHAN:  Winston Chan for the United States.  Good

8    morning, Your Honor.

9          MR. KOUSOUROS:  James Kousouros for Mr. Basciano.

10         MR. SAVITT:  Ephraim Savitt for Mr. Basciano.

11         MS. CARVLIN:  Stephanie Carvlin for Mr. Basciano.

12         THE COURT:  Did you put in a Notice of Appearance?

13         MS. CARVLIN:  I did, Your Honor.

14         MS. STAFFORD:  Ying Stafford for Mr. Basciano.

15         THE COURT:  Good morning Mr. Basciano.

16         THE DEFENDANT:  Good morning.

17         MR. CHAN:  I think we're here on the second status

18   conference on the issue of Mr. Basciano's placement in the SHU

19   which was exactly 30 days ago from this day.  At this time,

20   the Government is prepared to make a very limited disclosure

21   about the basis for that placement in the SHU in writing to

22   them under seal on the condition that the defendant and his

23   four attorneys each represent to the Court that the

24   information they receive today they will not disclose to

25   anyone other than each other until the investigation that is

1    the subject of his placement becomes finalized.

2              MR. KOUSOUROS:  We have discussed this as counsel

3    along with Mr. Basciano.  We need to see the letter, but

4    certainly, we have no problem with that.  We will not disclose

5    the contents of that letter to anybody, we will only discuss

6    it amongst ourselves.  That includes the investigators and

7    anyone else involved with the case.

8              THE COURT:  That includes, meaning, you're not going

9    to discuss it with the investigators.

10             MR. KOUSOUROS:  They're not going to discuss it with

11   the investigators.

12             THE COURT:  The only people who know about it for

13   the defense are the five people standing in front of me.

14             Mr. Basciano, you agree to that?

15             THE DEFENDANT:  Yes, Your Honor.

16             MR. CHAN:  That's fine, Your Honor.

17             I will say on the record that the nature of the

18   investigation involves threats of violence by Mr. Basciano

19   against individuals during the course of his previous trial.

20             MR. KOUSOUROS:  Your Honor, we are -- we have been

21   fighting for a month now to find some information out, so

22   obviously, we're pleased to know something.

23             What remains, however, is the fact that what you

24   have are just allegations that were either apparently made or

25   an investigation began somewhere at the end of July and we

1   still must insist, to the extent possible, on a resolution.

2   Mr. Basciano was taken out of his cell last week, they told

3   him they were taking him to a different area.  Instead, they

4   took him to a cell that had just been vacated by somebody,

5   shall we say, who had had some issues and had deposited feces

6   and urine all over the walls and that's the cell that

7   Mr. Basciano was taken to within the context of his special

8   housing confinement.  They then brought him cleaning materials

9   and told him to clean it up.

10             The Government has a right to investigate

11  allegations, we've been saying that since the beginning.  The

12  problem is while we're getting some limited disclosure here,

13  he remains in a special housing unit.

14             THE COURT:  Is he alone in this cell?

15             MR. KOUSOUROS:  He was alone in this cell?

16             THE COURT:  Was he alone in the prior cell?

17             THE DEFENDANT:  Yes.

18             MR. KOUSOUROS:  Yes.

19             The conditions are unbearable and I don't know what

20  this letter says, I don't know that it's going to give us

21  enough information to come to you and ask for a hearing but --

22             THE COURT:  Are you prepared to give them the letter

23  now?

24             MR. CHAN:  Yes.

25             THE COURT:  Well, I tell you what, why don't you

1    look at the letter.

2              MR. KOUSOUROS:  Great idea.

3              MS. CARVLIN:  Thank you.

4              THE COURT:  Why don't you come back, you can't

5    discuss the letter in public, but if there are steps you want

6    me to take after you read the letter you tell me what they are

7    without making any reference to the letter and I'll get to see

8    the letter as well I'm most interested in seeing the letter.

9              MR. KOUSOUROS:  Will we be able to do that today?

10             MR. SAVITT:  Hopefully.

11             THE COURT:  Do it at noon.  I'm not going to wait.

12   Why should I keep everybody in suspense.

13             MR. CHAN:  So we're clear, Judge, if we do discuss

14   at another court date today or in the future I ask that all

15   filings be under seal.

16             MR. KOUSOUROS:  Absolutely.

17             THE COURT:  All the filings will be under seal.  If

18   the issue that you have is as to his the conditions of his

19   confinement separate and apart from any allegations

20   involving -- what did you say -- I don't want to misspeak.

21             MR. CHAN:  Threats of violence against persons

22   somehow related to the last trial in which he was a defendant.

23             THE COURT:  Then as long as you don't discuss the

24   contents of the letter or how it applies to any individuals or

25   entities then we can have that discussion publicly.  If you

1   want to start talking about what's in the letter, then it has
2   to be done in camera.

3            MR. KOUSOUROS:  No problem.

4            THE COURT:  Not ex parte in camera because I'm not
5   having any ex parte discussions with the defense.

6            MR. CHAN:  Okay.

7            THE COURT:  All right.  So, why don't you distribute
8   the letter and give the Court a copy and we'll reconvene at
9   noon.  I'll ask the marshals to make a location available in
10  an interview room with Mr. Basciano to meet with his group of
11  attorneys.

12           MR. CHAN:  Thank you, Judge.

13           THE COURT:  Thank you.

14           (Case laid aside; later recalled.)

15           (In open court.)

16           THE COURT:  Be seated.  I want everyone here to
17  start.

18           (Defendant enters courtroom.)

19           COURTROOM DEPUTY:  Criminal cause for status
20  conference, United States versus Vincent Basciano.

21           Counsel state your appearances for the record.

22           MR. CHAN:  Winston Chan for the United States.

23           MR. KOUSOUROS:  James Kousouros for Mr. Basciano.

24           MR. SAVITT:  Ephraim Savitt for Mr. Basciano.

25           MS. STAFFORD:  Ying Stafford for Mr. Basciano.

Status Conference                    7

1          MS. CARVLIN:  Stephanie Carvlin for Mr. Basciano.

2          THE COURT:  Did you want something, Mr. Kousouros?

3          MR. KOUSOUROS:  Yes, Judge, we would respectfully

4  ask you to meet with us in camera.  We believe that it is of

5  the utmost urgency that we do so that we can hopefully

6  facilitate a resolution to this situation for many reasons

7  which, you know, just assume do in camera.  If you're willing

8  to hear us parse what we say and don't say on the record in

9  public.

10         MR. CHAN:  Judge, I would say that if the defendant

11 is making that motion the Government doesn't oppose it.  But

12 to the extent that we can tailor any sealing reasonably so

13 that if there are things that could be discussed on the record

14 we should do that now and not seal the entire proceeding

15 because I think we should try to tailor the sealing as

16 necessary.

17         MR. SAVITT:  Your Honor, could we make that decision

18 after we've had the in camera discussion?

19         THE COURT:  Well, that's possible.  I'm extremely

20 mindful of the importance of operating in the daylight, in

21 open court, and having read the document that I just read and

22 the attachments.  It would seem to me that at some point this

23 whole whatever-it-is should be publicly disclosed sooner

24 rather than later, but it depends on the completion of the

25 Government's investigation and I will hold the Government's

Status Conference                          8

1  feet to the fire in terms of getting it done as quickly as
2  possible so that that which can be placed on the public record
3  is placed on the public record at the earliest possible time.

4       I've already told the Government this when I was
5  first advised of this investigation.  I'll seal the courtroom,
6  we can do it right here and I'm going to have everyone leave
7  the room who isn't associated with the parties and we'll just
8  do it right here, I'm not planning to move, and then we'll
9  reopen the courtroom and anything that has to go on the public
10 record will then go on the public record.

11      I am going to make it very clear that you should be
12 very careful about what you want to discuss in private because
13 unless it relates to, unless it relates to those matters which
14 are sensitive as to public safety and security, they should
15 really be discussed in public.

16      So that's my position on that, and I will also
17 indicate that the Court has reached an independent conclusion
18 for those who are concerned that it is not necessary to close
19 the proceeding.

20      The Court has reached an independent conclusion
21 based on what it knows from the filings and from the briefings
22 that the Court has received in camera, ex parte, from the
23 Government that this issue involves the safety of people,
24 potentially; and it's my understanding that the Government is
25 not undertaking or has undertaken a significant investigation

1  which ordinarily no one would know about but for the fact the

2  precise nature of this problem.

3          Did I say it more or less correctly, Mr. Chan, as to

4  memorializing what's transpired thus far and what your

5  position is, generally, as to the need to seal the record of

6  the proceeding we're about to have.

7          MR. CHAN:  Yes, Judge.  Hundred percent correctly.

8          THE COURT:  Does the press have something it wants

9  to place on the record?

10         MR. DiSTEFANO:  Should I come up?

11         THE COURT:  You can come back because I always want

12 to hear what the The Fourth Estate has to say.

13         Yes, sir.

14         MR. DiSTEFANO:  Tony DiStefano of Newsday.

15         Just for the record, Your Honor, we would object, of

16 course, to a sealing of the entire proceedings but it seems

17 from what Your Honor has said, and what the Government's

18 position is, is a substantial body of the proceedings that can

19 be discussed in public.  We just want to remind the Court

20 that, you know, under the Second Circuit law that there has to

21 be some sort of substantial showing of a substantial harm or

22 overriding public interest that would necessitate sealing

23 parts of the proceeding or all of the proceeding and being in

24 the dark, like most of the public is, on this we would just

25 put that on the record that we object to, of course, sealing

1   of everything and we ask the Court to use its fundamental
2   discretion to see if there is any standing probability of harm
3   that requires any sort of sealing and that be made.

4          THE COURT:  Let me just say on the open record that
5   the nature of this issue is such that it would be very clear
6   to you, it will be very clear to you eventually, and would be
7   very clear to the Court of Appeals, that the subject matter of
8   this proceeding is extremely security sensitive involving
9   possible harm to individuals and that's the nature of it.

10         What comes of it, if anything, is an open question,
11  but the assertions that are made in the Government's
12  submission is such that the Court reaches that conclusion
13  reluctantly but quite conclusively.

14         MR. DiSTEFANO:  What I'm saying is if you can tailor
15  any sealing or the courtroom to a minimum.

16         THE COURT:  I will seal only that which needs to be
17  sealed for public safety and security.

18         THE WITNESS:  Thank you.

19         THE COURT:  Thank you.  I'm going to seal the
20  courtroom and we'll continue and then we will resume in open
21  court.

22         (Continued on next page.)

23

24

25

1              (SEALED PORTION OF TRANSCRIPT)

2              (Courtroom sealed; attorneys for the Government and

3       defense along with the defendant are present.)

4              THE COURT:  All right.  Let's go.  This is a sealed

5       proceeding subject to later motion or application for the

6       record to be unsealed under the appropriate circumstances.

7              Mr. Kousouros.

8              MR. KOUSOUROS:  If it please the Court, Your Honor,

9       we received a letter dated August 28th, today, essentially.

10      Attached to that letter are several handwritten notes, a

11      couple of which we believe we used for comparison for

12      handwriting analysis.  But the notes that we're most concerned

13      with is one which has a list of individuals:  You, an

14      Assistant United States Attorney, and three witnesses that

15      testified at the trial.  Your Honor, we are so concerned that

16      already even what's been made public is going to so poisonous

17      the jury pool that we are respectfully submitting to you that

18      a hearing be conducted immediately; and we're going to be more

19      up front than normal.  Normally, you sit on things, you think

20      about them, but here's the situation, Judge:  There's a note;

21      there are four names on it.

22             THE COURT:  I thought there were five names.

23             MR. KOUSOUROS:  Five names.

24             THE COURT:  Let's not miss anything.

25             MR. KOUSOUROS:  There are five names on that list,

1  Judge, and the Government -- basically, it's an innocuous
2  list.  There is a list with names on it.  There is no message
3  on the list, however, the Government has maintained in that
4  letter of August 28th that accompanying that list Mr. Basciano
5  gave it to an inmate and indicated to that inmate that he
6  sought the murder of the individuals on that list.

7          We submit to you that if you hold a hearing now
8  without any preparation by us, if you have the inmate brought
9  in, we will prove to you that there is nothing of the sort
10  going on; that, the explanation is simple and that it's
11  provable.  And if it's not, then we lose but it needs to be
12  addressed not only because the man is in the conditions that
13  he's in.

14          Those now take a back seat to issues that are even
15  of more paramount importance.  But let me just go to these
16  allegations.  This inmate, the person we believe to be this
17  inmate, is somebody who approached our client and told him
18  that his mother is some priestess for Santa Maria.

19          MS. CARVLIN:  Santeria.

20          MR. KOUSOUROS:  And told Mr. Basciano to make a list
21  of everybody involved, put it in your right shoe, stamp five
22  times every day during the trial, and it will help.

23          We can prove to you through other witnesses and
24  independent corroborative evidence that this is what this note
25  is.  And, instead what's going on, aside from the fact that

Status Conference (Sealed Portion)    13

1  he's in a feces-ridden cell, we now have an entire five rows
2  of press or how many people are out there walking around
3  thinking that three months before the commencement of a
4  retrial Vincent Basciano was threatening to kill people.

5      We can prove it to you independently, is what we
6  submit. This Thursday, the Eastern District of New York is
7  going to make its internal decision as to whether to seek the
8  death penalty. We only know what's in this note and we have
9  not been able to go any further in terms of addressing it.

10     So, the Eastern District of New York, I would
11 assume, as learned counsel certainly has the experience to
12 say, if there were ever an allegation that would point towards
13 seeking the death penalty, a conspiracy to kill a Judge,
14 prosecutor, and witnesses, ranks pretty high up on there in
15 addition to the death eligible homicide that we're talking
16 about. But we can't address it because it's not being aired
17 and Mr. Chan has made clear that their internal deadline of
18 this Thursday will be kept.

19     A submission was made by the defense last week,
20 obviously it doesn't include any of this, and the fact that
21 we're going to be given an opportunity to go down to
22 Washington and make a personal pitch, well, we submit that it
23 is an issue of constitutional dimension that we not have to
24 wait until an entire government's mind is made up to seek the
25 death penalty to then go and unring that bell and seek to

Anthony D. Frisolone, CSRR, RMR, CRI

Status Conference (Sealed Portion)                14

1  convince them not to because the allegations which were made
2  part of the convincing presentation were nonsense.

3        I don't take this lightly, ever, an allegation like
4  this.  When I use the word "nonsense" if, in fact, we prove to
5  you what we think we can prove to you that's what they are.
6  We take this as seriously as anything could possibly be taken.
7  But, at this point, after the man has been in the SHU for a
8  month, can't see his private investigator and give him
9  whatever personal direction he needs.  When lawyers have to
10 jump through hoops to get in to see him.  Ms. Carvlin did not
11 get in to see Mr. Basciano last week, for whatever reason her
12 name wasn't or wasn't right part of whatever list is involved.

13       We have a right, he's got a right to the effective
14 assistance of counsel for his upcoming trial.  He's got a
15 right to effective assistance of counsel in the determination
16 process for the death penalty.  And, Judge, we're telling you
17 that the Government should bring this inmate in for an in
18 camera hearing as private and secret as it needs to be under
19 the law and let us prove to you that there is no such
20 conspiracy; that there is no such danger to anybody or not but
21 give us that opportunity.

22            THE COURT:  Is there anything else?

23            MR. KOUSOUROS: There are independent witnesses and
24 there is independent corroboration in terms of locations which
25 can be proven and shown to you that will be brought to you

Anthony D. Frisolone, CSRR, RMR, CRI

1  during this hearing.

2          THE COURT:  All right.  Thank you.

3          MR. CHAN:  Judge, I'm not going to comment on

4  anything more than what's inside the letter.  It's a

5  continuing investigation.

6          I think that there are really two issues that Mr.

7  Kousouros brought up here.  First, the defendant wants to

8  challenge the conditions of his confinement and second --

9          THE COURT:  I can deal with the conditions of his

10 confinement.

11         MR. CHAN:  Right, we can have --

12         THE COURT:  We'll do that in public.

13         MR. SAVITT:  Right.

14         MR. CHAN:  There is the normal process in that is

15 for the first -- first of all, to seek administrative relief

16 and then to file a 2255.  Even in that process I'm not sure

17 that the Government is obligated to put its witness on the

18 stand.  I think that the Government is entitled to other ways

19 of making its submission to the Court for the Court to make

20 its determination about the reasonableness of those conditions

21 of confinement.

22         So, that process can continue, they can do what they

23 have to do, and they can file the motion and we can have

24 litigation about that.

25         In terms of a deadline for the U.S. Attorney's

1   office, it's our internal deadline; that's when we're going to
2   have our own internal meeting and a determination is going to
3   be made.

4           THE COURT:   You will accept an additional
5   submission?

6           MR. CHAN:   Sure, they can make submissions whenever.
7   They've already made two.

8           THE COURT:   There's no constitutional requirement
9   that this process occur, as I understand it, before the
10  Attorney General makes this decision.   It's an administrative
11  process that the Justice Department goes through, you're not
12  necessarily entitled to a hearing.   You're not -- and correct
13  me if I'm wrong -- but, certainly, if allegations have been
14  made, you're certainly -- or if it appears that there are
15  allegations as to some other improper activities by the
16  defendant -- you certainly should have the opportunity to
17  provide whatever additional written submission you want to the
18  U.S. Attorney and let that be taken into consideration as
19  well; and the matter is going to go to the Justice Department
20  by the end of the week and you'll be able to make that
21  submission also to the Justice Department and bring it up at
22  any meeting in Washington and it would seem that that's how it
23  ought to be handled.

24          MR. CHAN:   That's correct, Judge.   Just like when
25  the Government chooses not to indict someone, that's purely an

1   executive function that does not create rights for the
2   defendant.

3        MR. SAVITT:   Your Honor, may I speak to this because
4   these are obviously as serious an allegation or allegations as
5   can possibly be made in a case and nobody takes anything like
6   that lightly.

7        But, to be totally forthcoming, I believe that under
8   these circumstances where the committee in the U.S. Attorney's
9   Office is about to make a determination as to what to
10  recommend to the Attorney General, we have to act quickly here
11  on the defense part and we are willing, perhaps
12  uncharacteristically so, to assist the Government in its
13  investigation, and there is a witness outside this courtroom
14  with whom we did not speak:  Mr. Basciano's wife who knows the
15  genesis of this list.  It's not the only list that exists; we
16  have not spoken to her, and we don't have any objection to the
17  Court speaking to her in the presence of counsel or to
18  Mr. Chan speaking to her.

19       THE COURT:   Don't you understand I'm not an
20  investigator.

21       MR. SAVITT:   I understand that, Judge.

22       THE COURT:   It's not my job, it's their job, the
23  Government's job, and I'm not about to take up their
24  responsibility.

25       I've reached no conclusions about what's here but

1   the Government is investigating what appears to be a very
2   serious security issue and they have received this list from
3   someone, apparently, and they're looking into it; and the
4   handwriting I'm advised, is Mr. Basciano's and, in effect,
5   you're telling me, yes, that it is Mr. Basciano's handwriting
6   but that this list was made under circumstances different from
7   those than others might have indicated.

8          What Mr. Kousouros is basically saying is that this
9   is a process and I'm not engaged in that process. The process
10  I'm engaged in is supervising several criminal cases in which
11  Mr. Basciano is a defendant, so I'm not about to get -- I've
12  never been an investigator; I'm not going to start doing that
13  now.

14         If you want to have conversations with the
15  Government and make a proffer about this, that's up to
16  Mr. Chan and his colleagues as to whether to countenance such
17  a or consider such a proffer. That's an executive function,
18  that's not a judicial function. A judicial function is to
19  make sure that the process is fair, that Mr. Basciano's
20  conditions in the SHU are not intolerable, to try to deal with
21  that. I'm willing to deal with that, that's not a problem for
22  me. I'm in no way influenced in doing that by anything that's
23  proffered by the Government. I'm here to be fair to the
24  Government. I'm fair to the defense. It's disturbing to see
25  a list with my name on it. In and of itself, that's enough to

1  raise my eyebrows but this list wasn't, apparently wasn't
2  handed to the Government by the Archbishop of New York as a
3  list of people to pray for, it was obtained by some other
4  source that's more problematical.

5          I'm willing to deal with the conditions of
6  incarceration issue.  I'm not willing to conduct a hearing on
7  the Government's assertions or the investigation that is
8  ongoing.  Those are two distinct issues for me and you deal
9  with the Government on any proffer.  I just don't want to get
10  mixed up in that, it's not my problem, it's not my
11  responsibility, and it's really not appropriate, in my view,
12  that I do so.  Yes.

13          MR. SAVITT:  We recognize that, Judge.  But what I
14  was perhaps what I said in an unartful way I was trying to
15  emphasize for the record that obviously mindful of the
16  restrictions that we're under we didn't speak obviously to
17  anyone.

18          THE COURT:  You're not allowed to.

19          MR. SAVITT:  We will continue not to do so.  But, we
20  are going to speak to Mr. Chan and make a certain proffer and
21  leave it up to the Government to take our information and
22  investigate it.

23          THE COURT:  Here's what I can do.  If you all have
24  something to discuss with me this afternoon after you've had
25  your conversation or at some other point this week, I'm

1   available to meet with you except for tomorrow, tomorrow is
2   not a possibility.  But, if there's some way that I can be
3   helpful to deal with this, resolve it, I will be if it's an
4   appropriate function.  But to hold a hearing, that's what
5   grand juries do.  They present this kind of evidence to grand
6   juries, not to judges, and if you want to have a conversation
7   with the Justice Department that's up to you and your client
8   to do.

9        But, I don't hold hearings on these kinds of
10  circumstances because, really, there's an investigation
11  ongoing.  I don't know what will come of the investigation, if
12  anything, and it would be inappropriate for me to take on an
13  executive function.  It's not my job.

14       MR. KOUSOUROS:  Judge, if I may.

15       My only problem is there is a degree to which the
16  client's conditions, the defendant's conditions are
17  inextricably intertwined with this issue because he's in the
18  situation that he's in because of the investigation.  And,
19  there seems to be -- I understand that -- and, Judge, I've
20  read your prior rulings, you were very cognizant of this issue
21  and you have, you know.

22       THE COURT:  I know all about my prior rulings.

23       MR. KOUSOUROS:  You've put him back in population.
24  The point is that was then and this is now and so for now what
25  we're saying is we would respectfully ask for a hearing so

1   that you can have the facts before you in order to make a
2   determination as to whether the conditions that he's housed in
3   are, in fact, appropriate.  How else to deal with them.  We're
4   telling you they're intolerable and the Government comes
5   forward with a letter and a purported reason for them and
6   there doesn't seem to be an end in sight from what we can see
7   and so he's going to stay in those conditions.  They can't be
8   dealt with unless a factual determination can be made.

9          THE COURT:  Other things can be dealt with; other
10  things are inappropriate for me to deal with.  I'm saying to
11  you and the Government, too, that to the extent that this
12  whole process can be expedited it should be expedited.  I've
13  already said that to the Government prior to this.  I've said
14  that to the Government two weeks ago on the record in court
15  and I stand by what I said.  But I'm not going to get in the
16  middle of what could be a situation where people's safety is
17  implicated, that's just inappropriate.  I'm not in law
18  enforcement; they are, and so they're going to have to deal
19  with it and you're going to have to deal with them.  But I
20  would like the process to be expedited -- Mr. Chan's heard
21  that from me numerous times.

22         I'm willing to give everyone, you know, a chance but
23  I'm not willing to take on their responsibility.  I'm not
24  going to hold a hearing on whether it's true or it isn't true,
25  that's not for me to do at this stage of the matter.  It's

1  just the wrong sequence, it's got to be dealt with.  Would you
2  please tell me where you are.

3          MR. CHAN:  We've reached a significant point in the
4  investigation where we can reveal this to the defendant and
5  defense counsel.  It's not fully complete, but we expect to do
6  that soon.  But I also know that once the investigation is
7  complete, I think that's not going to affect the conditions of
8  confinement in the sense that his placement in the SHU is not
9  only for the purposes of an investigation.

10         I think it's the Government's position that he's a
11 continuing threat because of the information that's been
12 disclosed and that we would litigate or our position would be
13 that he should be kept in the SHU for the duration of his
14 pre-trial detention.

15         THE COURT:  We'll get to that subject once this
16 particular aspect of it is more mature.  But, the Court has
17 made it very clear that this part of the matter needs to
18 expedited so at least we have some sense from the Government
19 where it's going to be on this, whether there is probable
20 cause to be where this was in the nature of a threat.

21         MR. KOUSOUROS:  What I'm hearing, and what's
22 concerning me, Judge, is that the Government has always wanted
23 to have Mr. Basciano kept in the Special Housing Unit.  You
24 told them that their reasons for that were not legitimate.
25         THE COURT:  That was a year ago.

1    MR. KOUSOUROS: I understand that. But what I'm
2  hearing is they're still kind of relying on that.

3    THE COURT: Well, no.

4    MR. KOUSOUROS: In addition to this information,
5  they didn't do that.

6    THE COURT: I'm sorry, Mr. Kousouros, you're new
7  here. He is a package, this whole situation is a package;
8  it's not just one thing or another thing, it's the whole
9  thing. And so, I don't know how I can deal with your concerns
10  on behalf of Mr. Basciano in terms of some long-term
11  assignment in the Special Housing Unit until this piece of the
12  puzzle becomes clearer to us; and the fact is that on its face
13  you've got five names of people, all of whom I know; one of
14  whom I know very well and why these names are on a list in
15  Mr. Basciano's handwriting which he allegedly gave to someone
16  in his unit or somewhere in the prison, that's a matter of
17  some interest to the Court.

18    MR. KOUSOUROS: As it should be, Judge.

19    THE COURT: All right.

20    MR. KOUSOUROS: Perhaps my final question.

21    THE COURT: It is your final question.

22    MR. KOUSOUROS: Can we put a timeframe on this? Is
23  it possible? Can we ask them for a timeframe?

24    THE COURT: I've asked the Government to move with
25  alacrity and I think they have demonstrated good faith in that

1  regard and gave them probable cause and they told me and you
2  and everyone last time they gave us an update.  They weren't
3  sure whether they would be able to disclose anything by today
4  and Mr. Chan is here, has disclosed the situation to you, and
5  so that much they have done in a short amount of time.
6  Considering all of the permutations that are involved here and
7  so I take their representations at their face value.  That's
8  all.

9        MR. CHAN:  Judge, we are moving as fast as we can.
10  Our next meeting in the case in general I think we have a
11  status conference in the Basciano '05 case two weeks from now.

12        THE COURT:  If we need to move before that we will.
13  But, I would, you know, to the extent that you wish to, you
14  can meet with Mr. Chan, I appreciate it if he and his
15  colleagues make themselves available to you.  That's his job,
16  not my job.  What I will do in open court is ask the
17  Government to contact the warden as to the health aspects of
18  Mr. Basciano's confinement, whether he should be moved to
19  another cell.  If that cell is not in good condition and that
20  the based on your representations that there are health
21  aspects to this.

22        MR. CHAN:  Yes, Your Honor.

23        MR. KOUSOUROS:  Is there any possibility that
24  Mr. Basciano be permitted to make a phone call once in a
25  while.  I mean, can we loosen this up just they're monitored,

1  they're taped.

2          THE DEFENDANT:  Visits, too.

3          MR. KOUSOUROS:  Can he visit with his wife once in a

4  while?  There's got to be a human aspect under whatever

5  conditions.  We know the calls are monitored, they're tape

6  recorded, so you're invited to listen, not that you need an

7  invitation, and he can see his wife once in a while.  It does

8  seem what I'm looking at here.  It certainly doesn't seem that

9  this is in a familial problem.  This isn't a matter of

10  messages being passed through family; this may take a while,

11  Judge.  We really mean when we say there is a human aspect to

12  it, too, and since you have this limited disclosure if a man

13  can be allowed a phone call once in a while one visit.

14          THE COURT:  Mr. Chan.

15          MR. CHAN:  It's not something can give an answer to

16  right now but I will discuss it with them.

17          THE COURT:  I am available here at the end of the

18  week.  If you want to, come back on Friday and see me about

19  this.  I'm willing to be here and available to you.  But here

20  is the thing:  Now that you know at least what's going on, on

21  the face of it, you ought to be talking to the Government if

22  you think that's appropriate, and if there is something that

23  you need to bring to me on Friday, I'll make myself available

24  to you on Friday, I won't wait the two weeks; but you have to

25  understand that this -- and I don't mean in any way shape or

1   form to disparage the defendant -- I have no, I am agnostic as
2   to what this all means.  You know what mean when I say
3   "agnostic"?  It means that I don't have a point of view as to
4   what -- whether this is true or not true whether it's real or
5   not real.  Whether it's a threat or it's not a threat.
6   Whether somebody is out there praying for me or somebody is
7   out there gunning for me.  All I want is for you two, if you
8   can, resolve whatever it is.  There may be a misunderstanding
9   or it may be real, I have not a clue, and I am not an
10  investigator, okay?

11         So that's where we are.  I'm going to bring back the
12  public and all I'm going to put on the record is something
13  with regard to the physical conditions and the SHU.

14         MR. KOUSOUROS:  Can you ask the marshals to keep him
15  available to speak to him afterwards?

16         THE MARSHAL:  How long a period of time.

17         THE COURT:  He'll need a while.  Thank you very
18  much, marshals.

19         MR. KOUSOUROS:  Thank you, Judge.

20         MR. SAVITT:  Did you want to set a time for Friday,
21  Your Honor?

22         THE COURT:  If needed, we'll do it.  Are you
23  available Friday, Mr. Chan.

24         MR. CHAN:  I'm not available.  If this is only about
25  telephone calls and visits, I think we can work something out

1   so I think it's better.

2          THE COURT:   Let me know if you need to see me at the

3   end of the week.   Thursday is a possibility.   Can you be

4   available?

5          MR. CHAN:   Yes.

6          THE COURT:   I'm around Wednesday, Thursday, Friday.

7   At your request, I can make myself available.

8          MR. KOUSOUROS:   Thank you, Judge.

9          THE COURT:   All right.   So, does the Government --

10  I'm going to seal this on motion of the Court on the grounds

11  that I've already set forth in the interest of public safety

12  and security and so as not to undermine an ongoing

13  investigation by the Justice Department okay.   Let's bring the

14  public back in, please.

15          (End of Sealed Portion.)

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

Status Conference                    28

1        (In open court.)

2        THE COURT:  Back on the record.

3        Is there anything else, Mr. Kousouros.

4        MR. KOUSOUROS:  No, Your Honor.

5        MR. CHAN:  I think that you had said that you wanted

6   to discuss the issue of his specific cell.

7        THE COURT:  Right.  With respect to the defendant's

8   conditions of incarceration in the SHU, I'm going to request

9   that the Government contact the warden of the MDC and to the

10  extent that there's some evidence that the actual physical

11  conditions of the cell which Mr. Basciano currently resides

12  create a health issue, I'm going to ask that he be moved to a

13  different cell long enough for the cell to be cleaned or just

14  moved to another cell which is in good condition, and I would

15  like to have a report back tomorrow on what the status is in

16  writing from the warden or his representative.

17        MR. CHAN:  Just to be clear.  The allegation is that

18  his current cell has feces in it but that he was forced to

19  clean it up himself.

20        MR. KOUSOUROS:  It's been cleaned but he was put --

21        THE COURT:  It was cleaned?

22        MR. KOUSOUROS:  It's been cleaned.  He was put in a

23  cell for a period of time with feces and urine and they

24  brought him some Comet and --

25        THE COURT:  Comet?

1          MR. KOUSOUROS:  Comet.

2          THE COURT:  It's fine.  I mean if it's fine.

3          MR. KOUSOUROS:  The feces are -- do the conditions

4    remain?

5          THE COURT:  What conditions remain that he's in a

6    cell.

7          MR. KOUSOUROS:  That he's in the SHU.

8          THE COURT:  I thought there were still hygenic

9    problems with the cell.

10         MR. KOUSOUROS:  Those are gone.

11         THE COURT:  That's done.  So we needn't do anything

12   about that?

13         MR. SAVITT:  That's correct, Judge.  It's been

14   cleaned up.

15         THE COURT:  He cleaned it?

16         MR. SAVITT:  He was initially -- he was ordered to

17   clean it.  Ultimately, some other orderly types who came in

18   and cleaned it which is the standard procedure within the

19   prison.

20         THE COURT:  People who are assigned?

21         MR. SAVITT:  People who are assigned to clean cells

22   specifically and I think that's the ones who gave him the idea

23   about the Comet.

24         THE COURT:  Gave who the idea?

25         MR. KOUSOUROS:  Various portions of the bedding area

Anthony D. Frisolone, CSRR, RMR, CRI

1  and in the cell in order to take away the stench of the

2  previous materials.  It would be a laboratory pristine cell.

3          THE COURT:  It's not what was described to me

4  earlier.

5          MR. SAVITT:  No longer, that's correct.

6          THE COURT:  And he's alone in the cell.

7          MR. SAVITT:  That is correct.

8          THE COURT:  It won't be necessary to do that right

9  now, but with regard to the other matter, my understanding is

10  that the defense is going to have whatever discussions it

11  thinks are appropriate with the Government and the Court is

12  going to make itself available later this week should it be

13  appropriate in the view of the parties for the Court to have

14  some sort of role in resolving some issues that the Court is

15  competent to consider and resolve where it may be appropriate

16  for the Court to be involved; and I'm mindful that where there

17  is an ongoing investigation by the Justice Department that

18  it's an executive function and not a judicial function.  But,

19  to the extent that I can be helpful I'm certainly standing

20  ready, willing, and available to assist the parties.

21          Is there anything else, Mr. Chan?

22          MR. CHAN:  No thank you.

23          THE COURT:  Anything else from the defense?

24          MR. SAVITT:  Not at this time.  Thank you very much,

25  Your Honor.

Status Conference                    31

1          THE COURT:  As I said earlier, the marshals have

2    agreed to keep Mr. Basciano in the building so that he can

3    meet with his defense team this afternoon.  Have a nice day.

4          MR. CHAN:   Thank you.

5          MR. SAVITT:  Thank you.

6          MS. STAFFORD:  Thank you.

7          MR. KOUSOUROS:  Thank you.

8          MS. CARVLIN:  Thank you.

9          (WHEREUPON, the proceedings were adjourned .)

10

11                         *    *    *

12

13                   CERTIFICATE OF REPORTER

14      I certify that the foregoing is a correct transcript of
     the record of proceedings in the above-entitled matter.
15

16

17

18
     _____
19   Anthony D. Frisolone, CSRR, RMR, CRI
     Official Court Reporter
20

21

22

23

24

25

Anthony D. Frisolone, CSRR, RMR, CRI



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TJS:WYC
F.#2005R00060

*One Pierrepont Plaza*
*Brooklyn, New York 11201*

*Mailing Address:*  *147 Pierrepont Street*
*Brooklyn, New York 11201*

August 28, 2006

<u>Under Seal</u>
<u>By Hand Delivery</u>
James Kousouros, Esq.
Ephraim Savitt, Esq.
Ying Stafford, Esq.
Stephanie Carvlin, Esq.

Re:  United States v. Vincent Basciano
<u>Criminal Docket No. 05-0060 (NGG)</u>

Dear Counsel:

Please be advised that the government has received
information that, during the trial of <u>United States v. Basciano,</u>
<u>et al.</u>, Cr. No. 03-929 (NGG), the defendant Vincent Basciano
provided to another inmate at the Metropolitan Correctional
Center a handwritten note, a copy of which is enclosed, and
indicated to the inmate, in sum and substance, that he (Basciano)
sought the murder of the listed individuals.

Forensic analysis by the FBI laboratory has confirmed
that the handwriting on the note is a positive match to
Basciano's known handwriting. Copies of the handwriting analysis
reports and exemplars, as well as a fingerprint analysis report,
are enclosed.

You have been provided this information pursuant to
your and the defendant Basciano's representations to the Court
that you and Basciano will not disclose the contents of this

letter, or its enclosures, to any individual who is not Basciano or the above four attorneys of record.

Yours truly,

ROSLYNN R. MAUSKOPF
United States Attorney

By: _____

John Buretta
Winston Y. Chan
Thomas J. Seigel
Assistant U.S. Attorneys

Enclosures

cc:   Hon. Nicholas G. Garaufis

2

Green Avenues

Judge Nicholas CaraCounlis-

Dominick Cicale

Tommy Lee

Lou Tartaglione

FI (Rev. 5-1-50)

LABORATORY
FEDERAL BUREAU OF INVESTIGATION
QUANTICO, VA 22135

To:     New York

Your No.:

Title:     OPERATION

OCDETF-LCN AND ITALIAN
ORGANIZATIONS

The following specimens were submitted                              and were examined in the
Questioned Documents Unit:

Q28        One sheet of paper bearing notations beginning "Greg Andres Judge
           Nickolas..." (1B45, E03942125)

K1         Fingerprints of VINCENT J. BASCIANO

Enclosures (15)



Page 1 of 2

This Report is Furnished for Official Use Only

Kc2        Three photocopied pages of various documents bearing purported known writing of VINCENT J. BASCIANO

K4        Sheet of paper bearing the purported know writing of VINCENT J. BASCIANO (1B23, E03846891)

The following specimen was submitted ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and was examined in the Questioned Documents Unit:

K3        Original of a portion of Kc2

**Results of Examination:**

Due to the limited quantity of comparable known writing and the presence of characteristics in the questioned writing that are not accounted for in the available known writing, no definite conclusion could be reached whether the questioned writing on specimens Q28 and previously submitted Q26 and Q27 (Laboratory number 050826003 QB FT) was or was not prepared by VINCENT J. BASCIANO, writer of specimens Kc2 through K4. However, from the limited comparisons that could be conducted, characteristics in common were observed when comparing specimen Q28 with the known writing of BASCIANO, Kc2 through K4, to indicate he may have prepared that questioned writing.

If further examinations are desired, dictated and undicated known writing should be obtained from BASCIANO. The known writing should be handwritten and hand printed on separate sheets of paper similar to the questioned specimens, and should be removed from the writer's view upon completion. Numerous repetitions may be necessary in order to obtain naturally prepared writing. Undictated known writing consists of handwriting prepared during normal course of business activity. Possible sources of undictated writing include business papers, letters, canceled checks, and/or applications.

Indented writing of unknown value was observed on specimens Q28 and K4. Four photographs of each specimen are enclosed for your investigative assistance. Electrostatic lifts of the indented writing are considered secondary evidence and will be returned separately.

**Remarks:**

Digital images of the submitted evidence are retained. You will be separately advised of the disposition of the submitted evidence and secondary evidence.

▆▆▆▆▆▆▆▆
Questioned Documents Unit
▆▆▆▆▆▆▆▆

(*732)409-3059 - HOME
(-917) 921 - 1839 - CELL
    GENNADY - Marcova
(1-917) 520 - 2552 - MOB
(1-718) 876 - 1900 - off
    GFI - MORTGAGE

ξ 888 - ξ 86
    -Ub

AJ
(516) 633 - 7393 (Cell)

OFFice - Joy Air
Jean
    732 - 970 - 9786.
    732 - 489 - 8682. cell

732 - 841 - 6337

(718) 904-1715

*Anthony's Waterproofing Inc.*

GENERAL CONTRACTING
SILICONE · TUCK POINTING· CAULKING
CEMENT COATING · BRICK WORK · ROOFING
PAINTING · EPOXY CEMENT
INTERIOR · EXTERIOR

ANTHONY SCHULAZ, PRESIDENT



Key Cast

917-299-8041

212-288-0838

(runas - (720- Pack-)

FRANK

917-688-8827





Get him Down
or I will
Kill Him!

You could just let someone know that

What I am saying is coming from you I think it

will make everyone feel Better All Together it was

12 - Guys - Two weeks Give yet. They Did one

I let you know that week (one left) - My Son comes from the

On Visit -

Okks

  


7-1 (Rev. 5-16-00)

 **FBI Laboratory**

2501 Investigation Parkway
Quantico, Virginia 22135

## REPORT OF EXAMINATION

To:   New York C-10

Your No.:

Title:    OPERATION

OCDETF-LCN AND ITALIAN
ORGANIZATIONS

The following specimen was examined in the Questioned Documents Unit:

K5      Copies of one envelope and two page letter bearing the purported known writing of
VINCENT J. BASCIANO

This report contains the result of the questioned document examinations.

### Results of Examinations:

It was determined that the questioned writing on previously submitted specimen Q28
was prepared by VINCENT J. BASCIANO, purported writer of specimen K5 and previously
submitted specimens K2 through K4 excluding the overwriting.

Remarks:

Page 1 of 2

For Official Use Only

Remarks:

Digital images of specimen K5 are retained. You will be separately advised of the disposition of the submitted evidence.

Questioned Documents Unit

For Official Use Only

NAME Vincent J. Rescigno
REGISTER NUMBER 30694-057
METROPOLITAN CORRECTIONAL CENTER
150 PARK ROW
NEW YORK, NY 10007

Debra Kalb
32 Old Hempstead Road
New City, New York 10956

□ COPY

Sunday - 2:27 am  7/1:00 pm.

Send me more Declarations! J.V.R :)

                                                    You Home? us ince How
                                                         much

Hello my love...

         I love you Dibs, I can't wait until I get my
minutes back. I get depressed when I can't call a few times a
day. I need to hear your voice and I need to speak to my son.
It gives me strength.

         It's funny, As I watch TV everything I see I hope I
get the opportunity to do with you. I just watches the "new guy"
me there was a scene where he was riding a horse with his girl-
friend and I thought of you. Riding a horse! :) You're such a pig
x3. Seriously Dibs, I want to go horse back riding with you, and
also want to watch you ride a horse! :)

         By the way Kelly hasn't written me in months. I'm
one she's ____ about what this retard did to ___. I'm so disappointe
him. I thought he really loved me the way I loves him. I
gess I was wrong.

         I rather just hang with you. You'll never betray me. This
ally horrible what happened to me. Especially with Dominick. I
ok that ____. Anyhow I'm over it now and I'm back preparing for
trial, which by the way, opening statements shall stand next week!

         I miss speaking to Anthony. Apologize to Anthony for
me tell him I miss him more than he could possibly imagine. I
n't wait until Wednesday to speak to him again. Did you ever get
m his cop car or motorcycle cop bike?

         I received his pictures, he's beautiful just like his Googgam
m. When are you going to send me more pictures of you? You could
nd me a picture of you in a g-string you know! :) I'm so in love
th you, do you know that you little fuck!

         I could only imagine the deal the government gave to
mimick to testify against me. I bet they told him just to
stify against me in both of my trials and they let him go. I
ow he's been calling Angie three to four times a day. Have

you spoke to Angie. IF you do tell her to tell him he broke my heart. He's the last person in the world that I would've thought that would've turned on me. Tell her also that what the government is saying about Dumbkos, that I asked permission to kill her is not even at lie. I shall never see the people I love if that remotely the truth. But be careful because I think eventually he'll end up with him. Don't get trapped off because your calls are liable to be monitored. Don't trust anyone. But actually I'm more comfortable with women than with men.

In anycase make sure you stay strong even if I'm found guilty. I believe my case is riddled with appeal issues. I hope it doesn't come to that but if it does we still have hope with my appeals.

I heard that cou-cou has stomach cancer is that true. Or is that cou-cou just being cou-cou.

I only pray and hope I get back to you my babydoll. I need you to be back in my arms again.

I feel that I lived my life in vein. All the things I believed in and held sacred seem to have been a fraud. It seems that I only believed in them and I'm one of the few that followed the rules. But I'd rather die than to compromise my values.

That's it for now my love. I still have my special moment with you at 10:00 o'clock. I hope you haven't forgotten bout that.

My eye is still very blurry and when I blink I see lightning. Just when I thought that nothing else was going to go wrong. I could only see out of one eye and my closest friend turned on me, I'm numb. But nobody would ever be able to tell I'm always all smiles, and I always have a smile on my face. And a rocket in my pocket that can't wait to say hello to you my babydoll! ☺

Pleasant dreams and may God watch over you and my son. Give him kiss from me and let him give you a kiss from me. I love you Debra!

---- Working Copy ----                          Page    1

To:      New York
         C-10

Reference:

Your No.:

Title:       OPERATION
             OCDETF-LCN AND ITALIAN
             ORGANIZATIONS

The items listed below were examined in the Latent Print Operations Unit:

Q28           One sheet of paper bearing notations beginning "Greg
Andres Judge
              Nickolas..." (1B45, E03942125)

K1            Fingerprints of VINCENT J. BASCIANO

K4            Sheet of paper bearing the purported know writing of
VINCENT J.
                    BASCIANO (1B23, E03846891)

This report contains the results of the latent print examinations.

Results of Examinations:

Two latent fingerprints of value were developed on Q28. No latent prints
                of value
were developed on K4.

---- Working Copy ----                    Page    2

The latent fingerprints are not the fingerprints of VINCENT J
BASCIANO, FBI
#249066T9; ████████████████████████ or JOSEPH MASSINO, FBI #████████

Remarks:

The items, along with a photograph of the developed latent
fingerprints, will be
returned under separate cover.

Latent Print Operations Unit

SEP. 20. 2006  5:53PM

NO. 0123    P. 3



# Office of the Attorney General
## Washington, D.C. 20530

September 19, 2006

### LIMITED OFFICIAL USE

MEMORANDUM FOR HARLEY G. LAPPIN
        DIRECTOR
        FEDERAL BUREAU OF PRISONS

FROM:   THE ATTORNEY GENERAL

SUBJECT:  Origination of Special Administrative Measures (SAM)
      Pursuant to 28 C.F.R. § 501.3 for Federal Bureau of Prisons
      (BOP) Inmate Vincent Basciano

1. **General Provisions:**

  a. **Adherence to Usual United States Marshals Service (USMS), BOP and
    Detention Facility (DF) Policy Requirements** - In addition to the below-listed
    SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF
    policies regarding restrictions, activities, privileges, communications, etc. If there
    is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein,

### LIMITED OFFICIAL USE

SEP 20. 2006  5:54PM

NO. 0121   P. 4

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                          Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

where the SAM is more restrictive than usual USMS/BOP/DF policies, then the
SAM shall control.  If usual USMS/BOP/DF policies are more restrictive than the
SAM, then USMS/BOP/DF policies shall control.

   b.   **Interim SAM Modification Authority** - During the term of this directive, the
Director, Office of Enforcement Operations (OEO), Criminal Division, may
modify the inmate's SAM as long as any SAM modification authorized by OEO:

      i.   Does not create a more restrictive SAM;

      ii.   Is not in conflict with the request of the U.S. Attorney for the Eastern
District of New York (USA/EDNY),  Federal Bureau of Investigation
(FBI), or USMS/BOP/DF, or applicable regulations; and

      iii.   Is not objected to by the USA/EDNY, FBI, or USMS/BOP/DF.

   c.   **Inmate Communications Prohibitions** - The inmate is limited, within
USMS/BOP/DF's reasonable efforts and existing confinement conditions, from
having contact (including passing or receiving any oral, written or recorded
communications) with any other inmate, visitor, attorney, or anyone else except as
outlined and allowed by this document that could reasonably foreseeably result in
the inmate communicating information (sending or receiving) that could
circumvent the SAM's intent of significantly limiting the inmate's ability to
communicate (send or receive) information relating to criminal information.

2.   **Attorney/Client Provisions:**

   a.   **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The
inmate's attorney (or counsel) -- individually by each if more than one (1) -- must
sign an affirmation acknowledging receipt of the SAM restrictions document.  By
signing the affirmation, the attorney acknowledges his/her awareness and
understanding of the SAM provisions and his/her agreement to abide by these
provisions, particularly those that relate to contact between the inmate and his

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and
documented by the USA/EDNY, and who has received and acknowledged receipt of the SAM
restrictions document.  As used in this document, "attorney" also refers to more than one (1)
attorney where the inmate is represented by two (2) or more attorneys, and the provisions of this
document shall be fully applicable to each such attorney in his/her individual capacity.

LIMITED OFFICIAL USE

SEP 20, 2006  5:54PM                                                    NO. 3128   P. 5

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                  Page 3
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

attorney and the attorney's staff. The signing of the affirmation does not serve as
an endorsement of the SAM or the conditions of confinement, and does not serve
to attest to any of the factors set forth in the conclusions supporting the SAM.
However, in signing the affirmation, the inmate's attorney, and pre-cleared staff,
acknowledge the restriction that they will not forward third-party messages to or
from the inmate.

    i.    The USA/EDNY shall present, or forward, the attorney affirmation of
receipt of the SAM restrictions document to the inmate's attorney.

    ii.    After initiation of SAM and prior to the inmate's attorney being permitted
to have attorney/client-privileged contact with the inmate, the inmate's
attorney shall execute a document affirming receipt of the SAM
restrictions document and return the original to the USA/EDNY.

    iii.    The USA/EDNY shall maintain the original of the SAM acknowledgment
document and forward a copy of the signed document to OEO in
Washington, D.C. and the USMS/BOP/DF.

  **b.**  **Attorney/Client Privileged Visits -** May be contact or non-contact, at the
discretion of the USMS/BOP/DF.

  **c.**  **Attorney May Disseminate Inmate Conversations -** The inmate's attorney may
disseminate the contents of the inmate's communication to third parties for the
sole purpose of preparing the inmate's defense – and not for any other reason – on
the understanding that any such dissemination shall be made solely by the
inmate's attorney, and not by the attorney's staff.

  **d.**  **Unaccompanied Attorney's Pre-cleared Paralegal(s)[2] May Meet With Client -**

---

[2] "Precleared" when used with regard to an attorney's staff, or "pre-cleared staff
member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the
inmate's attorney with the inmate's defense, who has submitted to a background check by the
FBI and USA/EDNY, who has successfully been cleared by the FBI and USA/EDNY, and who
has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to
adhere to the SAM restrictions and requirements. As used in this document, "staff member" also
refers to more than one (1) staff member, and the provisions of this document shall be fully
applicable to each such staff member in his/her individual capacity. A "paralegal" will also be
governed by any additional DF rules and regulations concerning paralegals.

SEP. 26. 2006  5:54PM

NO. 628   P. 4

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                    Page 4
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

> The inmate's attorney's pre-cleared paralegal(s) may meet with the inmate
> without the necessity of the inmate's attorney being present. An investigator may
> not meet alone with the inmate. These meetings may be contact or non-contact, at
> the discretion of the USMS/BOP/DF.

e.   **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal
visitors provided that at least one (1) of the multiple legal visitors consists of the
inmate's attorney or pre-cleared paralegal. These meetings may be contact or
non-contact, at the discretion of the USMS/BOP/DF.

f.   **Legally Privileged Telephone Calls** - The following rules refer to all legally-
privileged telephone calls or communications:

   i.   Inmate's Attorney's Pre-cleared Staff May Participate in Inmate Telephone
   Calls - The inmate's attorney's pre-cleared staff are permitted to
   communicate directly with the inmate by telephone, provided that the
   inmate's attorney is physically present and participating in the legal call as
   well.

   ii.   Inmate's Initiation of Legally-Privileged Telephone Calls - Inmate-
   initiated telephone communications with his attorney or pre-cleared staff
   are to be placed by a USMS/BOP/DF staff member and the telephone
   handed over to the inmate only after the USMS/BOP/DF staff member
   confirms that the person on the other end of the line is the inmate's
   attorney. This privilege is contingent upon the following additional
   restrictions:

      (1)   The inmate's attorney will not allow any nonpre-cleared person to
      communicate with the inmate, or to take part in and/or listen to or
      overhear any communications with the inmate.

      (2)   The inmate's attorney must instruct his/her staff that:

         (a)   The inmate's attorney and pre-cleared staff are the only
         persons allowed to engage in communications with the
         inmate.

         (b)   The attorney's staff (including the attorney) are not to patch
         through, forward, transmit, or send the inmate's
         communications to third parties.

         LIMITED OFFICIAL USE

SEP. 20. 2006   5:54PM                                          NO. 9729    P. 7

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                              Page 5
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

    (3)    No telephone call/communication, or portion thereof, except as
           specifically authorized by this document:

           (a)    Is to be overheard by a third party.[3]

           (b)    Will be patched through, or in any manner forwarded or
                  transmitted to a third party.

           (c)    Shall be divulged in any manner to a third party, except as
                  otherwise provided in Section 2d.

           (d)    Shall be in any manner recorded or preserved.[4] The
                  inmate's attorney may make written notes of attorney/
                  client-privileged communications.

    (4)    If USMS/BOP/DF, FBI or USA/EDNY determines that the inmate
           has used or is using the opportunity to make a legal call to speak
           with another inmate or for any other non-legal reason that would
           circumvent the intent of the SAM, the inmate's ability to contact
           his attorney by telephone may be suspended or eliminated.

h.  **Documents Provided by Attorney to Inmate** - The inmate's attorney may
    provide his/her client with or review with the inmate, documents related to his
    defense, including discovery materials, court papers (including indictments, court
    orders, motions, etc.), and/or material prepared by the inmate's attorney. Any
    document not related to the inmate's defense must be sent to the inmate via
    general correspondence and will be subject to the mail provisions of
    subparagraphs 2i and 3g. Documents previously reviewed and cleared for receipt
    by the inmate, and already in the inmate's possession at the outset of the visit,
    may be discussed or reviewed by the inmate and the inmate's attorney during the
    visit

───────────────

[3] For purposes of the SAM, "third party" does not include officials of the
USMS/BOP/DF/FBI/Department of Justice (DOJ), or other duly authorized federal authorities
when acting in connection with their official duties. This section does not allow monitoring of
attorney/client-privileged communications.

[4] Except by USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities. This
section does not allow monitoring of attorney/client-privileged communications.

LIMITED OFFICIAL USE

SEP. 20 2006  5:54PM                                         NO 0123   P. 9

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 6
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

             i.     None of the materials provided may include inflammatory
                   materials, materials inciting to violence or military training
                   materials, or materials that may be used to pass messages from
                   inmate to inmate, unless such materials have been precleared by
                   the USA/EDNY and the FBI.

             ii.    The USA/EDNY may authorize additional documents to be
                   presented to the inmate.  If any document not listed or described
                   above needs to be transmitted to the inmate, consent for the
                   transmission of the document can be obtained from the
                   USA/EDNY without the need to formally seek approval for an
                   amendment to the SAM.

     i.    **Legal Mail** - The inmate's attorney may not send, communicate, distribute, or
        divulge the inmate's mail, or any portion of its contents (legal or otherwise), to
        third parties.[5]

        In signing the SAM acknowledgment document, the inmate's attorney and
        pre-cleared staff will acknowledge the restriction that only inmate case-related
        documents will be presented to the inmate, and that neither the attorney nor
        his/her staff will forward third-party mail to or from the inmate.

### 3.   Inmate's Non-legal Contacts:

   a.   **Non-legal Telephone Contacts -**

        i.     The inmate is limited to non-legal telephone calls with his immediate
             family members.[6]

---

[5] Legal mail is defined as properly marked correspondence (marked "Legal Mail")
addressed to or from the inmate's attorney of record.  All other mail, including that otherwise
defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[6] The inmate's "immediate family members" are defined as the inmate's
(USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

SEP. 26. 2006  5:54PM

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                    Page 7
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

        ii.     The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one (1) call per month, unless otherwise agreed upon by USMS/BOP/DF, FBI and USA/EDNY to allow more calls.

    b.    **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.     Is to be overheard by a third party.[7]

        ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

        iii.   Shall be divulged in any manner to a third party.

        iv.   Shall be in any manner recorded or preserved.[8]

    All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF-approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen (14) days advance notice.

    c.    **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member(s):

        i.     USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

        ii.    USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

---

[7] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties  This section does not allow monitoring of attorney/client communications.

[8] Except by USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

SEP 20. 2006  5:54PM                                        NO. 0429   P. 11

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                    Page 8
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

      iii.    USMS/BOP/DF shall document each such telephone notification.

   d.   **Family Call Monitoring** - All calls with the inmate's immediate family
      member(s) shall be:

      i.    Contemporaneously monitored by the FBI.

      ii.    Contemporaneously recorded (as directed by the FBI) in a manner that
         allows such telephone calls to be analyzed for indications the call is being
         used to pass messages soliciting or encouraging acts of violence or other
         crimes, or to otherwise attempt to circumvent the SAM.

      iii.    A copy of each inmate/immediate family member telephone call recording
         shall be provided by USMS/BOP/DF on a single, individual cassette tape
         (per call) for forwarding to the FBI. These recordings shall be forwarded
         on a call-by-call basis as soon as practicable.

   e.   **Improper Communications** - If telephone call monitoring or analysis reveals that
      any call or portion of a call involving the inmate contains any indication of a
      discussion of illegal activity, the soliciting of or encouraging of acts of violence or
      terrorism, or actual or attempted circumvention of the SAM, the inmate shall not
      be permitted any further calls to his immediate family members for a period of
      time to be determined by USMS/BOP/DF. If contemporaneous monitoring
      reveals such inappropriate activity, the telephone call may be immediately
      terminated.

   f.   **Non-legal Visits -**

      i.    **Limited Visitors** - The inmate shall be permitted to visit only with his
         immediate family members.[9] However, the inmate will not be permitted
         to visit with his son, Vincent Basciano, Jr. Any allowable visitor's
         identity and family member relationship to the inmate will be confirmed
         by the USMS/BOP/DF and FBI in advance.

---

[9] The inmate's "immediate family members" are defined as the inmate's
(USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

LIMITED OFFICIAL USE

SEP 28. 2006   6:13PM

## SPECIAL ADMINISTRATIVE MEASURES (SAM)

Page 9

Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

    ii.    **Visit Criteria** - All non-legal visits shall be:

        (1)    Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

        (2)    Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

        (3)    Limited to one (1) adult visitor at a time. However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

    g.    **Non-legal Mail** - Any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, BOP, and other federal law enforcement entities.

        i.    **General correspondence with limitations:** correspondence is restricted to only immediate family members. Volume and frequency of outgoing general correspondence with immediate family members only is limited to three (3) pieces of paper (not larger than 8 1/2 x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

        ii.    **General correspondence without limitations:** correspondence to U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, BOP, and other federal law enforcement entities. There is no volume nor frequency limitation on mail to/from these parties unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

≠. Johnson -

Miss Chaingose

Parish Priest

LIMITED OFFICIAL USE

SEP. 29. 2006   6:14PM

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                        Page 10
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

    iii.    All non-legal mail will be:

        (1)    **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

        (2)    **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

        (3)    **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

The Federal Government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

        (a)    A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

        (b)    A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

        (c)    A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

    iv.    **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                        Page 11
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

4.   **Communication With News Media:**

The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5.   **No Group Prayer:**

a.   The inmate shall not be allowed to engage in group prayer with other inmates.

b.   If an FBI and/or USMS/BOP/DF-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.   **No Communal Cells and No Communication Between Cells:**

a.   The inmate shall not be allowed to share a cell with another inmate.

b.   The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

7.   **Recording Conversations Between Cells:**

a.   USMS/BOP/DF/FBI are hereby authorized to place microphones in the hallways and elsewhere outside the inmate's cell to record any statements made by the inmate to other inmates or staff.

b.   The Notice of SAM given to the inmate shall notify the inmate that he is subject to such recording.

8.   **Cellblock Procedures:**

a.   The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

LIMITED OFFICIAL USE

SEP. 28. 2006   6:14PM                                                    NO. 8129   P. 14/18

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                           Page 12
Pursuant to 28 C.F.R. § 501.3
Inmate - Basciano

    b.    The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and
        existing confinement conditions, from communicating with any other inmate
        while in the cellblock area.

**9.    Commissary Privileges:**

    The USMS/BOP/DF shall restrict access to commissary items or any other objects
    determined by USMS/BOP/DF to be capable of being converted into dangerous
    instruments.

**10.    Access to Mass Communications:**

    To prevent the inmate from receiving and acting upon critically-timed information or
    information coded in a potentially undetectable manner, the inmate's access to materials
    of mass communication is restricted as follows:

    a.    **Periodicals/Newspapers -**

        i.    The inmate may have access to publications determined not to facilitate
            criminal activity or be detrimental to national security: the security, good
            order or discipline of the institution; or the protection of the public. This
            determination is to be made by the FBI, in consultation with the
            USMS/BOP/DF and USA/EDNY.

        ii.    Sections of the periodical/newspaper which offer a forum for information
            to be passed by unknown and/or unverified individuals, including but not
            limited to classified advertisements and letters to the editor, should be
            removed from the periodicals/newspapers prior to distribution to the
            inmate.

        iii.    The inmate shall then have access to the remaining portions of the
            periodicals/newspapers in accordance with USMS/BOP/DF policy, after a
            delay of at least thirty (30) days. In accordance with subparagraph 3g
            above, the FBI will review the remaining portions of the publications prior
            to distribution to the inmate and be responsible for any translations
            required.

        iv.    In order to avoid passing messages/information from inmate to inmate, the
            inmate shall not be allowed to share the publication(s) with any other
            inmates.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                          Page 13
Pursuant to 28 C.F.R. § 501.3
Inmate -Basciano

    b.    **Television and Radio** - The inmate is permitted access to radio and television channels/stations, in accordance with USMS/BOP/DF policies.

    c.    **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used to send messages to the inmate relating to the furtherance of criminal activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

11.    **Frequent Cell Searches:**

    USMS/BOP/DF is hereby directed to search the inmate's cell frequently and to take appropriate disciplinary action for any infractions.

12.    **Transfer of Custody:**

    In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

REDACTED

# RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY - PART B

Inmate Name: **BASCIANO, Vincent**
Reg. No. **30694-054**
Administrative Remedy Id.: **#424811-F2**

This is in response to your Request for Administrative Remedy dated August 27, 2006, wherein you request information regarding the security reasons that you are not suitable for general population.

You are being held in SHU in Administrative Detention, a non-punitive status for which restricted conditions of confinement are required to ensure the safety of inmates or others, the protection of property, or the security and orderly running of the institution. Specifically, you are being held in the Special Housing Unit (SHU) in Administrative Detention pending the outside investigation of a possible criminal act. Your housing status continues to be reviewed.

Accordingly, as you only seek clarification of the security reasons for your current housing assignment, your request for relief is granted.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons. U.S. Customs House - 7th Floor, 2nd & Chestnut Streets, Philadelphia, PA 19106, within 20 calendar days of the date of this response.

9/21/06
Date

Marvin D. Morrison, Warden

Exhibit I

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: _____
       LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

**Part A - REASON FOR APPEAL**

I was being held in 9- South, S.H.U. Since that time it has been brought to my attention theres an outside investigation. Which my B.P.9 also confirmed. These _____ On Sept. 2nd I have never _____ in 10- South. I have no radio, my lights are on 24/7, no access to fresh air _____ (inside), _____ complianed through my attorney, _____ clear up the matter with the A.U.S.A. My account of _____ been substantiated independently with sources that work in M.C.C. But it has fallen on deaf ears with the A.U.S.A. In order to fully take part in my upcoming trial and subsequent trial (which I am death penalty eligible) I ask to be removed from these harsh conditions immediately. My meetings with my attorneys are not as productive since I've been placed in S.H.U. under these severe conditions. I would appreciate your help in this matter.

    10/05/06    THANK YOU IN ADVANCE
    DATE    NO VISITS AND NO PHONE CALLS ALSO &amp;    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____

    DATE               REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

THIRD COPY: WARDEN'S ADMINISTRATIVE REMEDY FILE        CASE NUMBER: _____

**Part C - RECEIPT**

                              CASE NUMBER: _____

Return to: _____
       LAST NAME, FIRST, MIDDLE INITIAL.       REG. NO.       UNIT       INSTITUTION

SUBJECT: _____

    DATE              SIGNATURE, RECIPIENT OF REGIONAL APPEAL.

USP LVN                                          BP-230(13)
                                            JUNE 2002

**BASCIANO, Vincent**
Reg. No. 30694-054
Appeal No. 424811-R1
Page One

## Part B - Response

In your appeal, you claim you are under investigation and feel
the security measures implemented upon you at MCC New York are
harsh.   You claim these severe conditions hinder your privileges
and meaningful access to your attorney.  You request immediate
removal of the harsh conditions.

In your Request for Administrative Remedy, you requested to know
the reason for your continued placement in administrative
detention, as you claimed you did not know why you were in the
Special Housing Unit (SHU).  The Warden adequately addressed this
specific issue.   However, you did not raise specific concerns
regarding conditions of your SHU placement (i.e., visiting, phone
calls, recreation, attorney visits).  You must first present
issues for possible resolution at the institution before you
raise them in an administrative appeal.  These specific issues
will not be addressed in this response.  Accordingly, your appeal
is denied.

If you are dissatisfied with this response, you may appeal to the
General Counsel, Federal Bureau of Prisons.  Your appeal must be
received in the Administrative Remedy Section, Office of General
Counsel, Federal Bureau of Prisons, 320 First Street, N.W.,
Washington, D.C. 20534, within 30 calendar days of the date of
this response.

Date: November 7, 2006

D. SCOTT DODRILL
Regional Director